MOBIL OIL CORPORATION v DEPARTMENT OF TREASURY

Docket No. 70388. Argued May 8, 1984 (Calendar No. 3).—Decided
    September 6, 1985. Rehearing denied *post*, 1264.
    Mobil Oil Corporation petitioned the Michigan Tax Tribunal,
        challenging an assessment of a tax deficiency by the Depart-
        ment of Treasury. The tribunal affirmed, holding that a royalty
        payment of one eighth of the gross production of oil and gas
        from leased property made by the petitioner to a nonoperating
        landowner-lessor is a deduction for federal income tax purposes
        and must be added to the petitioner's Michigan single business
        tax base. The Court of Appeals, D. E. HOLBROOK, JR., P.J., and
        T. M. BURNS and McDONALD, JJ., affirmed in an opinion per
        curiam (Docket No. 61016). The petitioner appeals.
    In an opinion by Justice BOYLE, joined by Chief Justice
        WILLIAMS, and Justices RYAN, BRICKLEY, and CAVANAGH, the
        Supreme Court *held:*
    Oil and gas royalties given over to a landowner-lessor must
        be included in the single business tax base of an operator-
        lessee.
    1. An entrepreneurial taxpayer's initial tax base under the
        Single Business Tax Act is calculated by making specific addi-
        tions and subtractions, as provided in the act, to the taxpayer's
        federal taxable income, including all royalties paid by the
        taxpayer which were excluded or deducted from federal taxable
        income. The phrase "all royalties" in the Single Business Tax
        Act includes oil and gas royalties given over to a landowner-
        lessor by an operator-lessee, and the term "deduct" is used in
        its general meaning of "reduce," not in its technical sense, in
        the SBTA, § 9(4). In terms, the act taxes the payor of the
        royalties, not the payee.
    2. The Single Business Tax Act imposes a value-added tax,
        which taxes persons and entities on the amount of value they
        have added to the economy. As such, a value-added tax taxes
        the use of the resources of society. An income tax, by compari-
        son, taxes the return received for supplying resources to the

REFERENCES FOR POINTS IN HEADNOTES
[1-3] Am Jur 2d, Gas and Oil § 189 *et seq.*
    Meaning of "paying quantities" in oil and gas lease. 43 ALR3d 8.

economy. In theory, and in their pure form, both systems of taxation tax the same things, though at different stages of the economic process, and thereby generate the same amount of revenue and affect the economy identically. The main difference between the two systems, in practice, lies in who pays the tax. Under a value-added tax system, the entrepreneur, who combines the inputs of land, labor, capital, intermediate goods, and profit, pays the tax. Under an income tax system, the persons who receive the returns for supplying the inputs—workers, landowners, lenders, and entrepreneurs—pay the tax.

3. In oil and gas leases of the kind presented in this case, the landowner-lessor is a mere passive recipient of income, while the operator-lessee combines the inputs of land, labor, capital, intermediate goods, and profit in order to produce oil and gas. As such, under the VAT theory, it is the operator-lessee—in this case, Mobil—who is the proper VAT taxpayer. Thus, VAT theory also supports the conclusion that Mobil is the proper SBTA taxpayer on the oil and gas royalties presented in this case.

Affirmed.

Justices LEVIN and RILEY took no part in the decision of this case.

121 Mich App 293; 328 NW2d 367 (1982) affirmed.

1. TAXATION — SINGLE BUSINESS TAX — ROYALTIES — OIL AND GAS.

Oil and gas royalties given over to a landowner-lessor must be added to the single business tax base of an operator-lessee (MCL 208.9; MSA 7.558[9]).

2. TAXATION — SINGLE BUSINESS TAX — ROYALTIES — OIL AND GAS.

A corporate taxpayer's initial tax base under the Single Business Tax Act is calculated by making specific additions and subtractions to the taxpayer's federal taxable income, including all royalties excluded or deducted from the federal taxable income; the phrase "all royalties" as used in the act and as commonly understood includes oil and gas royalties given over to a landowner-lessor by the taxpayer-lessee as compensation for use of the landowner's property (MCL 208.9; MSA 7.558[9]).

3. TAXATION — SINGLE BUSINESS TAX — ROYALTIES — OIL AND GAS.

The single business tax is a value-added tax which is imposed upon an entrepreneur with respect to the value the entrepreneur adds to the economy by combining the inputs of land, labor, capital, intermediate goods, and profit; because an operator-lessee under an oil and gas lease is an entrepreneur, the operator-lessee is the proper party to be taxed on the portion of oil and gas royalties given over to the landowner-lessor (MCL 208.9; MSA 7.558[9]).

*Dickinson, Wright, Moon, VanDusen & Freeman* (by *Peter S. Sheldon* and *Anthony Ilardi, Jr.*) for the appellant.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Richard R. Roesch* and *Curtis G. Beck,* Assistant Attorneys General, for the appellee.

Amici Curiae:

*Miller, Canfield, Paddock & Stone* (by *Samuel J. McKim, III, P.C.,* and *John D. Rayis*) for Amoco Production Company; Exxon Company, U.S.A.; Federated Natural Resources Corporation; Gulf Oil Corporation; H. E. Tope, Inc.; Muskegon Development Company; Northern Michigan Exploration Company; Patrick Petroleum Company; Shell Oil Company; and Wolverine Gas and Oil Company, Inc.

BOYLE, J. This case involves the taxation of oil and gas royalties under Michigan's Single Business Tax Act (SBTA), MCL 208.1 *et seq.;* MSA 7.558(1) *et seq.* Petitioner Mobil Oil is an operator-lessee under an oil and gas lease. The lease in question obliges Mobil to give over to the landowner-lessor, either in kind or in money, 1/8 of the gross production from the property.

In computing its taxes for 1976, Mobil did not include the 1/8 of the gross production from its leased property, which it had given over to the landowner-lessor, in its Michigan tax base. Respondent, Michigan Department of Treasury, assessed a deficiency against Mobil's 1976 taxes equal to the single business tax on 1/8 of the gross production. Mobil petitioned the Michigan Tax Tribunal, which held in favor of the department. The Court of Appeals affirmed, and we granted leave to ap-

peal. We affirm the decision of the Court of Appeals.

## I

This matter is presented on stipulated facts and with agreed upon issues which can be summarized as follows:

Does the phrase "all royalties" as used in the SBTA, § 9(4)(g), MCL 208.9(4)(g); MSA 7.558(9)(4)(g), include oil and gas royalties? Does the use of the term "deduct" in the SBTA, § 9(4) mandate that oil and gas royalties not be reached by the SBTA, § 9(4)(g)? Do the economic realities of oil and gas royalty transactions and the system of taxation created by the SBTA require that oil and gas royalties be taxed to the recipient, rather than to the payor?

Section 9 of the SBTA, MCL 208.9; MSA 7.558(9), provides for the calculation of a taxpayer's initial tax base. The initial tax base is thereafter apportioned between Michigan and other states in which the taxpayer does business. MCL 208.40-208.69; MSA 7.558(40)-7.558(69). Certain adjustments and exclusions are then allowed against the Michigan tax base. MCL 208.23, 208.35; MSA 7.558(23), 7.558(35). What remains after these calculations have been performed is subject to the single business tax. MCL 208.31; MSA 7.558(31).

Section 9 begins the calculation of the corporate taxpayer's initial tax base with federal taxable income, SBTA, § 9(1). In the remainder of § 9, certain items are added to and subtracted from federal taxable income. Section 9(4), the section involved in the present litigation, provides:

Add, to the extent deducted in arriving at federal taxable income:

\* \* \*

(g) All royalties.

A related provision, the SBTA, § 9(7), provides:

Deduct, to the extent included in arriving at federal taxable income:

\* \* \*

(c) All royalties.

In the federal tax base, federal taxable income, royalties paid out are not included, but royalties received are included. Section 9(7)(c) requires royalties to be taken out of the SBTA tax base if they are included in the federal tax base, and § 9(4)(g) requires royalties to be added to the SBTA tax base if they are not included in the federal base. In other words, the Michigan SBTA, in terms, taxes the one who pays royalties and not the one who receives them.

Mobil here contends, however, that the SBTA, § 9(4)(g) is not applicable to the 1/8 of gross production it gives over to the landowner-lessor under its oil and gas lease. Mobil and amici curiae assert that the term "royalties" in § 9(4)(g) does not include oil and gas royalties; that, because oil and gas royalties are "excluded," rather than "deducted," in "arriving at federal taxable income," § 9(4)(g) does not require them to be added to the SBTA tax base; and that the economic realities of oil and gas transactions, and the system of taxation created by the SBTA, are such that the Legislature cannot have intended to reach oil and gas royalties under § 9(4)(g). Although the department does not dispute that these royalties are excluded in arriving at federal taxable income, it asserts that oil and gas royalties are included in the § 9(4)(g) term "royalties"; that the term "deduct"

in § 9(4) is used in its general meaning of "re-
duce," rather than in its technical sense; and that
the economic realities of oil and gas leases, and
the system of taxation established by the SBTA, are
such that § 9(4)(g) must also reach oil and gas
royalties.

## II. *Are "Oil and Gas Royalties" the "Royalties"*<br>*Meant to be Included by the* SBTA, *§ 9(4)(g)?*

Mobil and amici curiae argue[1] that oil and gas
royalties are not the kind of "royalties" referred to
by the SBTA, § 9(4)(g), while the department asserts
that they are. The essence of the argument by
Mobil and amici curiae is that § 9(4)(g) "royalties"
are payments made by the taxpayer for the use of
another's property, and that oil and gas royalties
cannot be characterized as "payments." "Pay-
ments," it is argued, are the giving over of the
payor's property to the recipient. It is contended
that an oil and gas royalty involves the giving
over, by the operator-lessee, of the recipient land-
owner-lessor's property, and thus cannot be under-
stood as a "payment." Mobil further points to the
SBTA, § 2(2), MCL 208.2(2); MSA 7.558(2)(2), which
provides that terms used in the SBTA shall have
the same meaning as those used in federal income
tax law unless otherwise defined. It contends that
federal income tax law characterizes oil and gas
royalties as a turning over of the recipient land-

---

[1] In this opinion, we often describe the arguments being made
against the department's construction of the SBTA, § 9(4)(g) as being
advanced by both Mobil and amici curiae. While this is usually in fact
the case, there are subtle differences in their arguments, and there
are also instances in which Mobil or amici curiae have advanced an
argument only implicitly or tangentially. Nevertheless, for ease of
discussion, we have, where possible, presented their arguments
jointly. We are persuaded that a particularized response to each
differing nuance of the arguments advanced would not lead to a
different substantive resolution of this case.

owner-lessor's property, rather than as a "payment," and thus concludes that, under the SBTA, § 2(2), the § 9(4)(g) term "royalties" cannot be interpreted to include oil and gas royalties.

## A. Oil and Gas and Other Royalty Transactions Compared

Oil and gas transactions are often extremely complicated, involving several parties, each of whom holds different kinds of interests relating to oil or gas beneath the surface of a particular piece of real estate. The fundamental transaction, like the one in the instant case, is an agreement between an operator and a landowner denominated as an "oil and gas lease."

Under the terms of the "lease," the operator-lessee is entitled to enter onto the surface of the property to explore for oil and gas, to drill wells, to install pumping equipment, and to extract oil or gas from the property. To the extent that it does not interfere with these activities of the lessee, the landowner-lessor is entitled to use the surface of the property; however, he may not extract oil or gas himself or transfer the right to do so to another for the duration of the lease. Upon execution of this lease, the operator-lessee typically pays to the landowner-lessor a sum of money which is denominated a "bonus." Further, under the lease, the operator-lessee must give over as "royalty" 1/8 of gross production, either in kind or in money, to the landowner-lessor and may retain as owner 7/8 of the oil or gas extracted.

It is evident that this transaction is a legal hybrid which cannot be neatly characterized as either a lease or a sale because it possesses some of the elements of each. The finite nature of the right acquired by the producer is typical of a lease, while the fact that the producer is entitled to

return the property in a depleted state at the end of the term and is entitled to ownership of a portion of the property, *i.e.,* 7/8 of the oil or gas brought to the surface, is more akin to a sale.[2]

Simply put, the question is: What is the nature of the right to the production from the property, the income from the thing? Has it been transferred, as in a lease, in its entirety, with a concomitant duty imposed on the transferee to make payments out of the income it receives from the property? Or has there been only a partial transfer of this right, and does the transferor remain the continuous owner of its "royalty share" of the income?

Whether they involve oil or gas, other mineral properties, patent, copyright, trademark, or franchises, there are two alternative interpretations of royalty transactions. In one view, the transferee receives the right to use the property and the right to all the income therefrom in return for giving the transferor an initial payment and a portion of the income produced; this can be referred to as the "complete transfer of rights" theory. In the second view, which we will refer to

---

[2] This mixture of elements is at the root of the difficulty in characterizing the 1/8 of gross production the lessor is entitled to receive under the oil and gas "lease." Is it a payment out of the lessee's property, akin to rent, or a return to the lessor of his property? Is the landowner paying the operator 7/8 of production for the service of extracting the landowner's 1/8 of the oil and gas, or is the operator paying the landowner 1/8 of production for use of the surface of the property and the acquisition of 7/8 of the oil or gas?

This case is submitted on stipulated facts; there has been no development, in the record below, of the various kinds of arrangements made in oil and gas leases in the Michigan oil and gas industry. Amici curiae have presented four model transactions in their brief. However, there is nothing in the record to indicate to what extent these models are applicable to the actual practice in Michigan. The sparsity of this record makes analysis of oil and gas leases difficult, and our conclusions about the proper characterization of them and other royalty transactions must therefore necessarily be based on general principles.

as the "partial transfer of rights" theory, the transferor gets the services of the transferee in return for giving it a portion of the income produced and also transfers the right to use the property to the transferee in return for an initial payment. Either view is persuasive in some respects and problematical in others because royalty transactions are, in reality, a mixture of various elements and thus difficult to characterize in a consistent conceptual manner.

## B. The Characterization of Royalty Transactions in Federal Income Tax Law

With respect to patent, copyright, trademark, franchise, and other royalty-type transactions, the federal income tax law adopts the complete transfer of rights theory: all income produced from the property is considered to belong to the transferee, and the royalties given over to the transferor are considered "payments" by the transferee. 34 Am Jur 2d, § 4410 et seq., Patents and Copyrights; § 5100, Rent and Royalty Income; § 5312, Assignment of Income; §§ 6201, 6203, Miscellaneous Business Costs; see also Chirelstein, Federal Income Taxation (2d ed), § 19.02. However, with respect to oil and gas transactions involving royalties, the federal income tax law takes a different approach.

The federal income tax theory of oil and gas transactions evolved through a series of cases which raised questions about the proper characterization, and thus income tax treatment, of various payments made and received in oil and gas transactions.[3] The rules that evolved from the cases

---

[3] Early cases dealing with oil and gas royalties involved questions of whether an operator-lessee under a lease of state or federal lands could be taxed; to what extent a state could regulate or forbid oil or gas extraction and transport; and particular problems with respect to Indian lands. See, e.g., United States v Noble, 237 US 74; 35 S Ct 532; 59 L Ed 844 (1915); Work v United States ex rel Mosier, 261 US 352;

established that the right to receive royalties represented an economic interest in the oil and gas itself and that royalty proceeds were thus analogous to rents received, rather than to sales proceeds.[4] This rationale justified taxing royalties received as ordinary income, and at a higher rate than capital gains. Both the courts and the Congress, however, adhered to the principle that the parties to such transactions were entitled to an "equitable" portion of the depletion allowance that

43 S Ct 389; 67 L Ed 693 (1923); *Ohio Oil Co v Indiana,* 177 US 190; 20 S Ct 576; 44 L Ed 729 (1900); *Oklahoma v Kansas Natural Gas,* 221 US 229; 31 S Ct 564; 55 L Ed 716 (1911); *Lindsley v Natural Carbonic Gas Co,* 220 US 61; 31 S Ct 337; 55 L Ed 369 (1911); *Walls v Midland Carbon Co,* 254 US 300; 41 S Ct 118; 65 L Ed 276 (1920). Cases on the taxation of income from oil and gas transactions involved questions whether a transfer was a sale or a lease, whether the proceeds received were entitled to treatment as ordinary income or capital gains, whether the proceeds paid were business expenses or payments for the acquisition of capital, and what parties would be entitled to depletion allowance deductions, and in what amount. See, *e.g., Stratton's Independence v Howbert,* 231 US 399; 34 S Ct 136; 58 L Ed 285 (1913); *Stanton v Baltic Mining Co,* 240 US 103; 36 S Ct 278; 60 L Ed 546 (1916); *Von Baumbach v Sargent Land Co,* 242 US 503; 37 S Ct 201; 61 L Ed 460 (1917); *United States v Biwabik Mining Co,* 247 US 116; 38 S Ct 462; 62 L Ed 1017 (1918); *Lynch v Alworth-Stephens Co,* 267 US 364; 45 S Ct 274; 69 L Ed 660 (1925); *Lake Superior Mines v Lord,* 271 US 577; 46 S Ct 627; 70 L Ed 1093 (1926); *United States v Ludley,* 274 US 295; 47 S Ct 608; 71 L Ed 1054 (1927); *Group No 1 Oil Corp v Bass,* 283 US 279; 51 S Ct 432; 75 L Ed 1032 (1931); *Burnet v Coronado Oil & Gas Co,* 285 US 393; 52 S Ct 443; 76 L Ed 815 (1932); *Murphy Oil Co v Burnet,* 287 US 299; 53 S Ct 161; 77 L Ed 318 (1932); *Bankers Pocahontas Coal Co v Burnet,* 287 US 308; 53 S Ct 150; 77 L Ed 325 (1932); *Palmer v Bender,* 287 US 551; 53 S Ct 225; 77 L Ed 489 (1933); *Burnet v Harmel,* 287 US 103; 53 S Ct 74; 77 L Ed 199 (1932); *United States v Dakota-Montana Oil Co,* 288 US 459; 53 S Ct 435; 77 L Ed 893 (1933); *Helvering v Twin Bell Oil Syndicate,* 293 US 312; 55 S Ct 174; 79 L Ed 383 (1934); *Thomas v Perkins,* 301 US 655; 57 S Ct 911; 81 L Ed 1324 (1936); *Helvering v O'Donnell,* 303 US 370; 58 S Ct 619; 82 L Ed 903 (1937); *Helvering v Elbe Oil Land Development,* 303 US 372; 58 S Ct 621; 82 L Ed 904 (1937); *Helvering v Mountain Producers Corp,* 303 US 376; 58 S Ct 623; 82 L Ed 907 (1937); *Anderson v Helvering,* 310 US 404; 60 S Ct 952; 84 L Ed 1277 (1940); *Kirby Petroleum Co v Comm'r of Internal Revenue,* 326 US 599; 66 S Ct 409; 90 L Ed 343 (1946); *Burton-Sutton Oil Co v Comm'r of Internal Revenue,* 328 US 25; 66 S Ct 861; 90 L Ed 1062 (1946).

[4] See, *e.g., Von Baumbach v Sargent Land Co,* n 3 *supra; Burnet v Harmel,* n 3 *supra.*

would be permitted with respect to the entire property.[5] The royalty recipient was permitted a depletion allowance in proportion to the percentage of production he was entitled to receive as royalty, and the operator—the royalty payor—was entitled to a depletion allowance in proportion to the percentage of production it was entitled to retain under the oil and gas lease. Thus, the parties are regarded as the owners of an undivided economic interest in the oil and gas in place.

The federal law appears to characterize the oil and gas lease as a partial sale of the thing itself, the oil and gas in the ground, for a period of years. In this partial transfer, the transferor retains ownership of a portion of the thing itself, that is, of 1/8 of the oil and gas in the ground. The "royalty" received by the landowner-lessor is not a payment out of the operator-lessee's property, but instead simply a return to the landowner of what he has owned at all times—1/8 of the oil and gas —but now in an extracted form.

It cannot be said, however, that the federal theory is entirely consistent or even that it is uniformly applied. For instance, the initial bonus payment received for execution of an oil and gas lease should be considered, under a partial sale theory, either as the proceeds from the sale of 7/8 of the oil and gas in the ground for a period of years, and as possibly subject to capital gains treatment, or as a pure rental payment of a sum certain which is unrelated to production. Instead, the federal income tax law treats the bonus as ordinary income of the landowner-lessor and also as being subject to a percentage depletion allowance. See Treas Reg, § 1.612-3(d) (1981).

---

[5] See, *e.g., Lynch v Alworth-Stephens Co,* n 3 *supra; Burnet v Harmel,* n 3 *supra; Murphy Oil v Burnet,* n 3 *supra; Palmer v Bender,* n 3 *supra.* See also Chirelstein, Federal Income Taxation (2d ed), § 6.08.

*C. The Proper Interpretation of the SBTA Term "Royalties"*

Mobil and amici curiae submit that the Legislature did not mean to include oil and gas royalties when it used the term "all royalties" in the SBTA, § 9(4). Since there is no legislative history on this point and no definition in the statute, we must turn to the common understanding of the term. *The Random House College Dictionary* defines "royalty" as:

> [A] compensation or portion of the proceeds *paid* to the owner of a right, as a patent or oil or mineral right, for the use of it . . . an agreed portion of the income from a work paid to its author, composer, etc., usually a percentage of the retail price of each copy sold . . . a royal right, as over minerals, granted by a sovereign to a person or corporation . . . the *payment* made for such a right. [*The Random House College Dictionary* (rev ed), p 1150. Emphasis added.]

This definition includes mineral and oil "royalties" with the "royalties" paid for patents and copyrights and refers to them as a "payment." Black's Law Dictionary defines "royalty" as:

> Compensation for the use of property, usually copyrighted material or natural resources, expressed as a percentage of receipts from using the property or as an account per unit produced. A payment which is made to an author or composer by an assignee, licensee or copyright holder in respect of each copy of his work which is sold, or to an inventor in respect of each article sold under the patent. Royalty is share of product or profit reserved by owner for permitting another to use the property . . . . In mining and oil operations, a share of the product or profit *paid* to the owner of the property. [Black's Law Dictionary (5th ed), p 1195. Emphasis added.]

Again, oil royalties are included among the listing of "royalty" transactions, and oil and gas royalties are referred to as "paid" for the use of property. In light of this common understanding of "royalties" as being a payment received by the transferor in patent, copyright, mineral, *and* oil and gas transactions, it seems probable that the Legislature also used the term in this manner. In the absence of indications to the contrary, it is logical to conclude that the Legislature also meant oil and gas royalties when it used the term "all royalties" in the SBTA, § 9(4)(g).

However, amici curiae argue that by use of the phrase "all royalties" the Legislature meant complete transfer of rights transactions, like patent and copyright royalty transactions, and not partial transfer of rights transactions. In essence, amici curiae argue that the SBTA, § 9(4)(g) is intended to tax only royalty *payments* and not royalty *shares* which must be "returned" to another, and that oil and gas royalties must be viewed as "shares" in accordance with the partial transfer of rights theory. Mobil also argues that since federal income tax law treats oil and gas royalties exclusively as royalty *shares* in accordance with the partial transfer of rights theory, the SBTA, § 2(2) requires that the SBTA, § 9(4)(g) not be construed to include oil and gas royalties. The SBTA, § 2(2) provides:

> A term used in this act and not defined differently shall have the same meaning as when used in comparable context in the laws of the United States relating to federal income taxes in effect for the tax year unless a different meaning is clearly required . . . .

If the theory of the federal income tax law were that of the partial transfer of rights, it would not characterize oil and gas royalties as "payments"

made by the transferee, but would instead see them only as the "share" of production belonging to the transferor. Instead, federal case law analogizes oil and gas royalties to rents, which are clearly "payments" and not "shares." See n 4. Nor, as noted, is the federal treatment of oil and gas royalty transactions entirely consistent. And while the Internal Revenue Code nowhere defines "royalties" or "oil and gas royalties," IRC, § 613(a) refers, with respect to properties containing natural deposits including oil and gas, to "any rents or royalties *paid* or incurred by the taxpayer in respect of the property," 26 USC 613(a) (emphasis added). Thus, Mobil's argument that the federal income tax law treats oil and gas royalties exclusively in accordance with the partial transfer of rights theory cannot prevail, even assuming that the SBTA, § 2(2) is applicable in the manner Mobil urges.

Nor are we persuaded that the partial transfer of rights theory is the only correct interpretation of oil and gas royalty transactions, while the complete transfer of rights theory is the only proper characterization of patent and copyright royalty transactions. Royalty transactions, whether with respect to patent, copyright, or oil and gas, can plausibly be characterized under either theory, and each view has both strengths and weaknesses.[6]

---

[6] The explicit provision in oil and gas leases that the royalty may be given over in kind arguably supports viewing the transaction in accordance with the partial transfer of rights theory. The right to receive a portion of the extracted oil or gas in kind suggests that the recipient is the continuous owner of that oil or gas and, thus, that the operator-lessee never owns that portion of the production. In patent and copyright transactions, in contrast, the right to royalty is commonly a right to receive a money payment, and not a right to receive the goods produced by use of the property in kind. This lends some support to the complete transfer of rights view in which the payor is seen as the owner of all the income produced in patent and copyright royalty transactions, and thus to the distinction between these royalty transactions that Mobil and amici curiae are advancing.

While the complete transfer of rights theory is generally the accepted view of patent and copyright royalty transactions, various states and the federal income tax law have differing interpretations, some closer to the partial transfer of rights theory, and some closer to the complete transfer of rights theory, with respect to oil and gas royalty transactions. See Hemingway, The Law of Oil and Gas (2d ed), pp 52-60. Mobil and amici curiae have not established that these oil and gas transactions, as a matter of law or in order to accurately reflect reality, must be characterized in the manner they advocate.

However, there is no apparent reason, in principle, why an inventor or author should not be entitled to receive a royalty in kind—in books published or in widgets produced—rather than in money. The reason that these transactions do not typically provide for a royalty in kind may be that authors and inventors are not usually in the business of selling books and widgets, and prefer to leave this function to the publisher or manufacturer. The reason that oil and gas leases provide that the royalty may be paid in kind lies, it seems, in history: at one time, landowner-lessors sometimes used some of the oil or gas produced from their property to heat and light their homes, and thus wanted a right to receive some of their royalty in kind. See Hemingway, The Law of Oil and Gas (2d ed), pp 391-395. These provisions in oil and gas leases also became useful in the oil crisis of the mid-70's, in which the prices of oil and gas skyrocketed. Many oil and gas producers were disadvantaged by the fact that they were parties to long-term contracts to supply oil or gas at fixed prices which were, now, below the market price. In this situation, landowner-lessors saw a potential advantage in exercising their option to receive the royalty in kind. It is notable, however, that even in this situation landowners did not directly exercise their option to receive oil or gas in kind, but instead simply provided that they would exercise this option *if* the regulatory agency did not approve a plan for the payment of royalties at the market rate. See *FERC v Pennzoil Producing Co*, 439 US 508; 99 S Ct 765; 58 L Ed 2d 773 (1979). As amici curiae concede, the prevalent current practice is that landowner-lessors receive their oil and gas royalties almost exclusively in money, and not in kind. Indeed, in the leases involved in the instant case, whether the royalty would be in money or in kind was at the option of Mobil, not of its lessors.

We are not persuaded that a technical difference found in the instruments of oil and gas transactions, as compared to patent and copyright transactions, with respect to whether the royalty is to be given over in kind or money, by itself, justifies such a different interpretation of these transactions as Mobil and amici curiae advocate, particularly when the practice, in fact, is the same.

Indeed, amici curiae and Mobil point to no authority to support their contention that the Legislature in fact intended to tax only royalty *payments* and not royalty *shares,* or that the Legislature distinguished between oil and gas, versus patent and copyright transactions, when it enacted the SBTA, § 9(4)(g). The SBTA in terms contains no such distinctions. Any support for the contention that the Legislature meant something different by the use of the term "royalties" than the common meaning and understanding of the term must be found in the parties' other arguments.

### III. *What Is the Significance of the Term "Deduct" in the SBTA, § 9(4)?*

Mobil and amici curiae rely on the use of the term "deduct" in the SBTA, § 9(4), which provides:

Add, to the extent deducted in arriving at federal taxable income:

\*   \*   \*

(g) All royalties.

Mobil argues that because it "excludes" the 1/8 royalty it gives over to the landowner-lessor from its gross income rather than "deducting" it in computing its federal taxable income, it is not required to add the 1/8 royalty to its SBTA tax base.

The taxpayer of federal income tax must report all of its gross income, which IRC, § 61 defines as "all income from whatever source derived." IRC, § 61(a)(1)-(15) and IRC, §§ 71-87 specifically list items included in gross income, and IRC, §§ 101-131 list items not included in gross income. 26 USC 61, 71-87, 101-131. Although the IRC and the regulations do not define the term "exclude," it is

used by tax experts to refer to items which are not included in gross income. Against this gross income, the taxpayer is permitted to subtract various items. Such subtractions from gross income are referred to as "below the line deductions" by tax experts. IRC, § 162(a) provides:

> There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—
>
> \* \* \*
>
> (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

Under these provisions, a user of a patent or copyright includes in its § 61 gross income all net receipts from the sale of the work or item produced by use of the property, and deducts, under IRC, § 162(a)(3), the royalties it has paid the inventor or author.[7] What is left after these calculations have been performed is "federal taxable income," the tax base which is subject to the federal income tax.

Mobil argues that "deduct" and "exclude" are technical terms with distinct meanings in tax law and should therefore be strictly construed in interpreting the SBTA. Mobil and amici curiae further contend that the Legislature used the terms "deduct" and "exclude" several times in the SBTA, § 9 in a manner which shows that it understood the difference in meaning between the terms in federal tax law, and that this shows that the Legislature's use of the term "deduct" in the SBTA, § 9(4)

---

[7] Thus, the SBTA, § 9(4)(g) requires the publisher or manufacturer to add these royalty payments to its SBTA tax base.

was deliberate.[8] Therefore, Mobil says, since it "excludes" the 1/8 of production from its gross income, it is not required to add it to its Michigan tax base under the SBTA, § 9(4)(g).

Assuming, as Mobil and amici curiae contend, that it is the practice of the oil and gas industry to exclude the portion of production which will be given over as royalty from its § 61 gross income, rather than deducting that royalty as a business expense under § 162, we note that neither the Internal Revenue Code nor the regulations so provide. Further, despite the assertion, undisputed by the department, that the Internal Revenue Service accepts the practice of excluding the portion of production given over as royalty from § 61 gross income in the case of oil and gas royalties, we are unable to conclude that, in directing that terms used in the SBTA "shall have the same meaning as when used in comparable context in the laws of the United States relating to federal income taxes . . . ," SBTA, § 2(2), the Legislature intended to encompass agency practice. Indeed, amici curiae concede difficulty in locating authorities documenting the practice of excluding oil and gas royalties, rather than deducting them. See amici curiae brief, p 30.[9] On this record, and in

---

[8] Amici curiae refers us to a case, *Amoco Production Co v Dep't of Treasury,* unpublished opinion of the Michigan Tax Tribunal, entered December 15, 1983 (Docket No. 57782), in which testimony was apparently presented that an earlier draft of the SBTA, § 9(4) contained the language "deducted or excluded." Our research has found no support for this testimony; the original SBTA bill introduced in 1975 used only the term "deducted" in § 9(4). House Bill 4640, introduced March 18, 1975, 1975 Journal of the House 644.

[9] The support given by General Counsel's Memorandum No. 22730, 1941-1 CB 214, and *Buffalo Eagle Mines, Inc v Comm of Internal Revenue,* 37 BTA 843 (1938), to the legitimacy of the practice of excluding, rather than deducting, oil and gas royalties is indirect at best. Further, the few quotations from secondary authorities provided by amici curiae to support the proposition that these royalties are exclusions from gross income address the question only tangentially

this context, we are not persuaded that the Legislature, despite use of the term "deduct," actually intended to encompass the described practice and provide for a distinct treatment of oil and gas royalties under the SBTA, § 9(4)(g).

Examination of the structure of the SBTA, § 9(4) also supports this conclusion. Subsections 9(4)(a), (b), (c), (d), (f), and (h) all involve expenses and costs of and payments by the taxpayer which can only be deducted in arriving at federal taxable income and which cannot be excluded. Subsection 9(4)(e), however, involves payments by the taxpayer which can be excluded as well as deducted. In this subsection, the Legislature used both terms, "deduct" and "exclude," so ensuring that all such payments, commissions, and fees of the taxpayer in that category were reached by the subsection and added to the SBTA tax base. Thus, in all other subsections of the SBTA, § 9(4), all items in the general category listed are reached. Were Mobil correct, the use of the term "deduct" in the SBTA, § 9(4) would operate to limit the reach of only subsection (g) by excluding "oil and gas royalties" from the category of "all royalties", while every expense in the categories listed in the other subsections of the SBTA, § 9(4) would be reached. The construction of § 9(4)(g) proposed by Mobil and

and are either contained in discussions of IRC, § 613 or rely on that section for support. But § 613 allows a deduction for depletion, which is to be a percentage of gross income from the property "excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property," IRC, § 613(a). This language could imply the very opposite of what Mobil and amici curiae contend: that royalties paid are a part of § 61 gross income and are to be excluded only when calculating the percentage of income that will be allowed as a depletion deduction under § 613. Thus, there is very little support, or documentation, for the practice of excluding, rather than deducting, oil and gas royalties. The Legislature may simply not have been aware of the practice at all. We find it interesting, in this context, that before the Michigan Tax Tribunal Mobil agreed to stipulate that these oil and gas royalties were *deducted* in arriving at federal taxable income.

amici curiae would constitute a deviation from the structure and system of § 9(4). It strains belief that the Legislature would except an item, which the plain language of the statute would appear to include, in such an indirect way. We conclude that Mobil's and amici curiae's reliance on the SBTA, § 9(4) term "deduct" is misplaced.

### IV. *What Is the Proper* VAT *Treatment of the Economic Realities of Oil and Gas Transactions?*

The next argument by Mobil and amici curiae is that the economic realities of oil and gas royalty transactions, combined with the system of taxation created by the SBTA, compel the conclusion that an operator-lessee should not be taxed on the royalty it gives over to a landowner-lessor under the SBTA. The economic reality advanced is based on the partial transfer of rights theory with respect to oil and gas transactions. This theory is combined with an interpretation of the SBTA to suggest that the SBTA, § 9(4)(g) does not reach oil and gas royalties.

Mobil and amici curiae point out that the SBTA imposes a value-added tax (VAT), which taxes persons and entities who have added value to the economy on the amount of the value they have added. It is submitted that since the landowner-lessor is the continuous and uninterrupted owner of the royalty oil or gas, both in the ground and when it is extracted, it is the landowner-lessor who has added value to this portion of production from the leased property. As a result, they conclude, it is the landowner-lessor who must be taxed on the oil or gas royalty under the SBTA. Analysis of this argument requires a comparison of income taxes and value-added taxes.

### A. *Comparison of Income and Value-Added Taxes*

Both income taxes and value-added taxes are

taxes on the economic process; the difference between them lies in what point of the process they attach to or, to put it another way, in what elements of the economic process they tax. The income tax taxes what has been received from the economy, when it becomes "income." The VAT taxes economic activity itself and can be described in two ways: as a tax on the economic actor's use of the scarce resources of society, or as a tax on the value the economic actor adds to the economy. In the end, the income tax and the VAT tax the same things, but at different stages of the economic process, and thus generate the same amount of revenue and affect the economy identically.[10]

The economic process consists of the use of various inputs in order to produce final goods. These inputs include: raw materials or land, intermediate goods, labor, capital, and profits. The value added to the economy by the production of final goods is the sum total of all the inputs into their production. Haughey, *The economic logic of the single business tax,* 22 Wayne L R 1017, 1018-1020 (1976). The value added by the production of a final good is the sum of the value of the raw materials, intermediate goods, labor, capital, and the profit which were combined in order to produce that final good. The value-added tax is imposed on the value added by the production of the final good or, to say the same thing in another way, upon the use of all these inputs in adding value to the economy.

The value of the inputs used is measured by the cost to the producer of obtaining the use of those

---

[10] See, *e.g.,* Musgrave & Musgrave, *Public Finance in Theory and Practice* (New York: McGraw-Hill, 2d ed, 1976), pp 224-227, 338. ("The same result [as an income-type VAT on net national product] may also be accomplished by a general income tax, since the bases of a net product and an income tax are in fact the same.")

inputs. The value of the worker's labor is the wages the laborer is paid to produce the good. The value of the raw materials, intermediate goods, and capital is what the producer must pay in order to obtain the use of these things. And the profit is what keeps the producer-entrepreneur in business, which is measured by the difference between the cost of production and the receipts from sales.

It is apparent that the income tax and the VAT are in reality opposite sides of the same coin. The value of the labor used in production, and the cost to the producer of obtaining the labor, is the wages paid to the laborer, and the income the worker receives for providing labor to the economy. The value of the capital and intermediate goods used is what the producer must pay to obtain them, and that is equivalent to the receipts of their suppliers for providing the labor, entrepreneurial effort, and capital with which to produce them. The profit which keeps the producer in the business of producing is the income received for doing so.

Both the income tax and the VAT tax the value of the inputs used in the economic process as measured by the value, or price, ascribed to that input by the economy. The basic difference is that the VAT taxes the price paid for the input and the income tax taxes the price received for the input.[11] The VAT taxes the use of the resources of society;

---

[11] It is for this reason that an income tax and a VAT (imposed on comparable tax bases) will affect the economy identically. Both have the effect of raising the price paid for inputs and reducing the price received for supplying those inputs. For example, the producer either pays lower wages due to the VAT imposed on those payments, or pays higher wages due to the income tax imposed on the laborer. The costs of labor for the producer, and the wage-income actually retained by the worker, will be the same under either system. (This assumes, of course, equal bargaining power between the parties, and that labor prices are perfectly elastic.) See also ns 14 & 16.

the income tax taxes the return received for supplying those resources to the economy.

Practically speaking, the main difference between an income tax and a VAT can be determined by examining *who* is a taxpayer under each system. Under a VAT system, the entrepreneur, who combines the inputs of land, labor, capital, intermediate goods, and profit, pays the tax. Under an income tax system, those who receive the payments pay the tax: labor on the returns (wages) it receives, the suppliers of land on their returns (rents), the suppliers of capital on the returns (interest, dividends, etc.) they receive, and the suppliers of entrepreneurship on their returns (profit).

## B. Methods for Computing Taxpayers' Tax Base

Under an income tax system, the tax base of an entrepreneur is computed by adding together the total income, or gross receipts, received from supplying land, labor, capital, or entrepreneurship, to the economy. The costs of producing that income are then subtracted from that total: purchase costs of intermediate goods; wages paid to labor; rents paid to land; investment costs, or depreciation costs, for the use of capital.[12] What remains is the taxpayer's profit, and the income tax is imposed on this.

A taxpayer's VAT base can be computed in two ways. In the first, the "addition" method, the entrepreneur adds together all the costs of factors of production used—wages paid, rents paid, profits, and either the costs of acquiring or of using up capital. In the second, the "subtraction" or "invoice," method, the taxpayer adds together gross receipts and subtracts from these the costs paid for

[12] See n 14.

intermediate goods,[13] as well as either what was paid to acquire capital goods or the costs of their depreciation. See Haughey, *supra,* 22 Wayne L R 1018-1019. The tax base resulting from either method is the same.

The tax imposed by Michigan's SBTA is a value-added tax using a consumption-type base.[14] The

[13] The payments made to purchase intermediate goods must be subtracted from the taxpayer's tax base in order to avoid the multiple taxation of intermediate goods, which are goods which go through several production stages before becoming final goods. In the absence of special treatment for intermediate goods, a tax of fifty percent would, for example, take half the wheat produced by the farmer, half the flour produced by the miller, and half the loaves of bread produced by the baker. As a result, wheat would be taxed at a rate of 87½ percent, while apples sold by the farmer directly to a consumer would be taxed only at a rate of fifty percent. Therefore, the tax base of every entrepreneur must include only the value the enterprise has added to the intermediate goods, and not the cost of acquiring the intermediate goods themselves.

Thus, the farmer would be taxed on the wheat he produces at the full rate—for him, the wheat is a raw material, not intermediate goods. The miller, however, would be taxed only on the value added to the wheat by grinding it into flour. The miller would subtract what was paid to the farmer in order to acquire the wheat; the remaining tax base, consisting of labor, land, capital, and profits, would equal the value added to the wheat by making it into flour. Similarly, the baker would subtract the cost of acquiring the flour, and the remaining sum, consisting of labor, land, capital, and profits, would equal the value added by baking the flour into bread.

[14] There are two kinds of VATs generally discussed in the literature, income-type VATs and consumption-type VATs. In practice, the main difference between these two kinds of VATs appears to be in their treatment of capital. (This differing treatment may also have implications for certain other transactions, however.) Capital goods are first produced and acquired by an enterprise (investment), and are then used up in the production of other goods (depreciation). For this reason, special treatment of capital is necessary in a tax system in order to avoid taxing it twice. In the federal income tax system, the acquisition of capital (investment) is taxed: because no deduction is given for such investments, the enterprise must pay for the capital goods with after tax dollars and is thereby in effect taxed on the acquisition. However, depreciation is not taxed: through "depreciation deductions" the firm reduces its taxable income, and its "using up" of the capital goods is thereby, in effect, exempted from taxation. A VAT which uses this method of taxing capital once and only once is called an "income-type VAT." In contrast, a consumption-type VAT does not tax investment in capital—it allows a deduction, called an "investment credit," for the purchase price paid for the capital goods—but

SBTA uses the addition method to compute the taxpayer's tax base.[15] For ease of administration, however, the SBTA uses the federal income tax system as a reference and starting point and, through various required additions and subtractions, converts the federal tax base into a consumption-type VAT base.

## C. The Proper SBTA Taxpayer

Mobil and amici curiae, relying on the partial transfer of rights theory of oil and gas royalty transactions, contend that the landowner-lessor is the appropriate taxpayer under the SBTA. They assert that the landowner-lessor, as the continuous owner of the 1/8 "royalty share" of production

then taxes its depreciation. The SBTA imposes a consumption-type VAT: § 9(4)(c) subjects the depreciation of the taxpayer's capital goods to the tax, and § 23 gives an investment credit for the acquisition of capital goods.

[15] This computation is complicated by the fact that the Michigan SBTA uses the federal tax base, federal taxable income, as the starting point for computing the taxpayer's tax base. Profit is the income received from supplying entrepreneurship to the economy. Federal taxable income consists of the taxpayer's net profit from business activity; thus, when the SBTA, § 9(1) begins the computation of the taxpayer's tax base with federal taxable (business) income, it is taking the taxpayer's profits as the starting point. In the subsections which follow, the income tax base of federal taxable income is converted, through required additions and subtractions, into a value-added tax base. Sections 9(2) through 9(6), in addition to making adjustments for special deductions and exclusions permitted under the federal income tax, convert the starting base of federal taxable income into a value-added tax base by requiring the taxpayer to add the value of inputs used in production to profits. Section 9(5), for instance, requires the taxpayer to add compensation paid (the value of the input labor used), and § 9(4)(d), (f) requires the taxpayer to add any dividends or interest paid (payments made for the use of capital). Sections 9(7) through 9(9) continue the conversion of the income tax base into a value-added tax base by requiring the taxpayer to subtract income received from supplying inputs to the economy. Subsections 9(7)(a) and (b), for example, require the taxpayer to subtract dividends and interest received. Thus, while the federal income tax excludes dividends and interest paid from federal taxable income, and includes dividends and interest received, the SBTA, through §§ 9(4)(d), (f), and 9(7)(a), (b), turns this around, taxing the taxpayer on dividends and interest paid, but not on dividends and interest received. In doing so, the SBTA imposes a value-added tax: it taxes the user, and not the supplier, of capital.

from the property, is the entity which adds value to it. Even if the partial transfer of rights theory is the proper characterization of the "economic realities" involved in this transaction, we are unable to accept this contention.

Mobil and amici curiae are equating the ownership of an input with the adding of value. Their theory is that it is the owner and supplier of the input who adds the value taxed by a VAT. This theory would require the supplier of labor and the owners and suppliers of capital and land to be the VAT taxpayers. However, the VAT taxes not the owner and supplier of inputs, but rather the user of those inputs. To be sure, it is to some extent a matter of definitional fiat to say that one economic actor, rather than another, is the one who adds value to the economy.[16] But the question asked by VAT theory is not "who is the owner of the input?" but, instead, "who is using the input and combining it with others in order to add value to the economy?"

The answer is plain. The landowner-lessor, in oil and gas leases of this type, is not involved in production at all, but is merely a passive recipient of income. It is the operator-lessee who adds labor, entrepreneurial initiative, and capital (drilling

---

[16] It appears to be more a matter of definitional fiat than principled distinction that value-added theory says that it is the employer, rather than the worker (who combines the labor with tools in order to refine intermediate goods), who is the entity adding value to the economy. Nevertheless, this is the way in which value-added theory views the production process. Amici curiae and Mobil, in their analyses, are simply asking the wrong questions. The question of who is the owner of the input is appropriate in an income tax system, since determining who the owner is also determines who is receiving the income, see, *e.g.*, Chirelstein, *supra,* Part C (attribution of income), and § 11.01 (constructive receipt), but not in a value-added tax system.

This is not to say, however, that the Legislature is bound by value-added theory in its designation of who shall be the taxpayer under the SBTA. See, *e.g.*, 1985 PA 27, § 9(4)(g)(*i*) (amendment of the SBTA, § 9, removing oil and gas royalty payments from the SBTA tax base).

equipment, etc.) to the land in order to extract the raw material, oil or gas. The operator-lessee, not the landowner-lessor, combines inputs and adds value to the economy.[17] Therefore, it is the operator-lessee who is the entrepreneur in oil and gas leases and who "uses" the 1/8 "royalty share" of production according to VAT theory. This means that it is the operator-lessee who is the proper VAT taxpayer on this 1/8 of production.

Consequently, we must also reject the final argument made by Mobil and amici curiae. We hold that the SBTA, § 9(4)(g) requires oil and gas royalties given over to a landowner-lessor to be added to the operator-lessee's SBTA tax base.

The judgments of the Court of Appeals and the Michigan Tax Tribunal are affirmed.

WILLIAMS, C.J., and RYAN, BRICKLEY, and CAVANAGH, JJ., concurred with BOYLE, J.

LEVIN and RILEY, JJ., took no part in the decision of this case.

---

[17] Seen in this context, it is clear that Mobil and amici curiae's reliance on the partial transfer of rights characterization of the transaction is misplaced. Under this theory, the landowner-lessor would be purchasing the operator-lessee's services of oil or gas extraction, and paying the operator-lessee 7/8 of production for those services. Analyzed in accordance with VAT theory, the landowner-lessor would be the entrepreneur, and the proper taxpayer. He would be taxed on all inputs used, including the wages paid to labor—and thus, on the 7/8 of production retained by the operator-lessee under the lease. We cannot accept this conclusion as a proper interpretation of the legislative purpose in enacting the SBTA, nor do Mobil and amici curiae take their analyses so far in their briefs.