J C PENNEY COMPANY, INC v DEPARTMENT OF TREASURY

Docket No. 99464. Submitted April 14, 1988, at Lansing. Decided September 6, 1988.

J.C. Penney Company, Inc., created a wholly owned financial subsidiary, the J.C. Penney Financial Corporation, to fund its inventory acquisition and business expenses. According to the terms of an agreement between J.C. Penney Company and Financial, J.C. Penney Company sells unpaid customer accounts generated by J.C. Penney credit card sales to Financial, which uses those assets to back the issuance of short-term commercial paper to institutional investors. The interest transferred to Financial includes the total principal amounts billed and recorded during the period, together with interest accrued and charged to the account during that period; future interest charges on the account remain the property of J.C. Penney Company and become available for sale to Financial only after those charges are assessed and recorded on J.C. Penney Company's books. J.C. Penney Company recorded all finance charges imposed on its credit card customers as Penney's income for tax and accounting purposes. The Michigan Department of Treasury determined that when Penney sold undivided interests in its customer charge accounts to Financial, it also sold Financial the right to receive future accruing interest on those obligations. Thus, according to the department, such interest is income to Financial and not Penney, depriving Penney of the right to deduct that interest from its income for purposes of the Single Business Tax Act. The department ruled that improper deductions had been made in the calculation of Penney's single business tax for tax years ending in January of 1978, 1979, 1980, and 1981 and issued an assessment of $1,498,400 in taxes and $478,008 in interest against Penney. Penney challenged the assessment before the Michigan Tax Tribunal, which up-

REFERENCES

Am Jur 2d, State and Local Taxation §§ 254 et seq., 524 et seq., 603 et seq.

See the Index to Annotations under Income Tax; Interest on Money; Taxes.

held the department's determination and assessment. Penney appealed.

The Court of Appeals *held:*

The agreement between Penney and Financial, the expert testimony before the Tax Tribunal, and a third-party transaction between Penney and Citicorp Industrial Credit Corporation all compel the conclusion that Penney did not transfer the right to receive future interest to Financial, that such interest was income to Penney, and that such interest income, having been reported on Penney's federal return, was properly deductible by Penney in computing its Single Business Tax Act liability.

Reversed.

1. TAXATION — TAX TRIBUNAL — NONPROPERTY TAX CASES — APPEAL.

Review of Tax Tribunal decisions in nonproperty tax cases is limited to determining whether the decision is authorized by law and whether any factual findings are supported by competent, material, and substantial evidence on the whole record (Const 1963, art 6, § 28).

2. TAXATION — SINGLE BUSINESS TAX — INTEREST — CREDIT CARDS.

A company which sells to a wholly owned subsidiary its total credit card principal amounts billed and recorded during a billing period together with interest accrued and charged to the accounts during that period but not including the right to future interest charges on the accounts is entitled to deduct from its single business tax liability any of the future interest it receives and reports as interest income on its federal corporate income tax return (MCL 208.9[7]; MSA 7.558[9][7]).

*Weisman, Trogan, Young & Schloss* (by *Sydney D. Goodman* and *Anthony V. Trogan*), for petitioner.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Richard R. Roesch* and *Thomas J. Kenny,* Assistant Attorneys General, for respondent.

Before: BEASLEY, P.J., and HOOD and R. L. TAHVONEN,* JJ.

---

* Circuit judge, sitting on the Court of Appeals by assignment.

R. L. TAHVONEN, J. The J.C. Penney Company
appeals as of right from a judgment of the Michigan Tax Tribunal upholding the Treasury Department's determination that certain sums had been
improperly deducted in the calculation of Penney's
single business tax for tax years ending in January of 1978, 1979, 1980, and 1981. The department's determination resulted in an assessment of
$1,498,400 in taxes and $478,008 in interest. It is
this assessment that prompts the present appeal.
We conclude that the taxpayer is correct and that
the tribunal erred reversibly.

### THE FINANCING PLAN

The J.C. Penney Company is a Delaware corporation based in New York City which conducts a
general merchandising business in Michigan and
elsewhere. Its retail sales consist of cash sales and
credit card transactions. Although credit transactions include third party cards (e.g., Visa), this
litigation concerns only credit cards and customer
accounts established by Penney.

The obligations of Penney's credit card customers are specified in retail installment credit agreements between the customer and Penney. During
the relevant accounting periods, a customer who
used Penney's card could avoid a finance charge by
paying the balance of the account within thirty
days. If the balance was not paid within the period, a finance charge would be imposed at a rate
set forth in the charge card application and credit
agreement. All customer accounts receivable,
whether later sold to a third party or retained by
Penney, were collected by Penney.

To fund its inventory acquisition and business
expenses, Penney created a wholly owned financial
subsidiary in 1964. The relationship between Pen-

ney and this subsidiary, J.C. Penney Financial Corporation, is governed by a "receivables agreement." The terms of this agreement and the business relationship of Penney and Financial have not substantively changed since 1964.

Under the terms of the agreement, Penney sells unpaid customer accounts generated by credit card sales to Financial, which uses those assets to back the issuance of short-term commercial paper to institutional investors. By pledging these assets, Financial enjoys the highest Moody's and Standard & Poor's ratings and can therefore raise the financing needed by Penney at rates lower than the federal funds rates, i.e., the rate at which banks borrow from the government.

The receivables agreement characterizes the transferred assets as "unpaid obligations of our customers under Credit Agreements," or "Customer Obligations." The agreement defines "customer obligation"

> as of any date the total recorded unpaid amount of the obligations (including assessed finance charges) of a customer under a Credit Agreement, whether or not all or part of such obligations shall have been conveyed to you hereunder, but such term shall not include [defaulted obligations or those sold to others] . . . .

Paragraph 1 of the agreement provides that periodically Penney will convey to Financial

> all our right, title and interest in and to such dollar amount of Customer Obligations (not theretofore conveyed to you) outstanding as of the end of the last complete Accounting Period as shall be specified in the instrument effecting such conveyance.

Thus, at regular intervals, Penney sells to Fi-

nancial undivided interests in customer account balances as of a specified date. The interest transferred includes the total principal amounts billed and recorded during the period, together with interest accrued and charged to the account during that period. The aggregate balance of principal and accrued interest is therefore available for sale to Financial; future interest charges on the account remain the property of Penney and become available for sale to Financial only after those charges are assessed and recorded on Penney's books. It is only after interest has been earned by Penney, accrued to the customer's account, and actually recorded and "booked" against the account that the obligation balance is sold to Financial.

Mr. Irwin Cohen, a certified public accountant, testified that future interest charges were not conveyed to Financial:

> What was sold from Penney to Penney Financial is the asset. It is a customer balance that existed at a point in time including whatever was contained prior to that date in the account be it purchases, net of payments, finance charge, returns, adjustments of any type. It was the balance that existed at the time.

Mr. Frederick Lynch, who conducted the audit for the department, gave similar testimony:

> *Trogan* [*Penney's attorney*]: Now, your testimony was I believe that your reading of the Receivables Agreement was that the customer obligation conveyed to Penney Financial did not include the right to future accruing interest; is that right?
> *Lynch*: Yes.
> *Trogan*: That is your opinion?
> *Lynch*: That is my opinion.

The precise dollar amount of customer obligations sold to Financial is determined by Penney based on its cash needs at the time of sale.

The second paragraph of the receivables agreement provides that Financial will pay Penney a purchase price equal to the face amount of the obligations conveyed, less a "hold back" sufficient to protect Financial against uncollectible accounts. On a monthly basis, Penney prepares and submits to Financial a settlement statement, consisting of a detailed accounting of new conveyances and collections from customers. Finance charges paid by customers do not appear as a separate entry on the settlement statement.

Financial's compensation was also specified in the agreement. Penney paid Financial 152 percent of Financial's expenses. Each month Financial submits a bill to Penney for its total operating expenses, including interest paid on the commercial paper it issued and its administrative costs, such as rent and salaries. In effect, Financial's compensation is calculated on a "cost-plus" basis and does not correspond to the amount of customer obligations sold to or held by it. Testimony indicated that this method of computing compensation is a standard practice between a retailer parent and its financial subsidiary.

The annual reports of Financial further explain its relationship with Penney:

> Our principal source of income consists of monthly charges to the Penney Company in an amount sufficient to cover our fixed charges at least one and one-half times. Under our agreement with Penney Company, we withhold from the purchase price of Penney's customer receivables an amount sufficient to provide a contract reserve account equal to 5 per cent of the total receivables owned by us at the end of each month. The parent

company administers its retail sales credit program, bears all costs of its program, and receives all finance charge income from customer accounts owned. The Financial Corporation, therefore, has never incurred any losses on receivables purchased.

Mr. William Burns, manager of special tax projects for Penney, testified that Penney recorded all finance charges imposed on its credit card customers as Penney's income for tax and accounting purposes. Mr. Burns stated the charges were income to Penney since only finance charges assessed against an account prior to conveyance were included in the assets transferred to Financial.

Penney's independent outside auditor concurred that Penney properly reported all finance charges as its income in its tax returns, financial reports, and statements to the Securities and Exchange Commission. Testimony was offered that there is nothing unusual from an accounting or business perspective about separating an asset from the right to receive future interest on that asset.

## THE DEPARTMENT'S POSITION

The claim of the department, upheld by the Tax Tribunal, is that when Penney sold undivided interests in its customer charge accounts to Financial, it also sold Financial the right to receive future accruing interest on those obligations. That being so, the department contends that such interest is income to Financial and not Penney, depriving Penney of the right to deduct that interest from its income for purposes of the Single Business Tax Act.

## THE ISSUE

The dispositive question is whether the Tax Tribunal erred in failing to allow Penney to deduct interest paid to it by its charge card customers from income reported on its Single Business Tax returns.

## THE STANDARD OF REVIEW

This Court's review of Tax Tribunal decisions in nonproperty tax cases is limited to determining whether the decision is authorized by law and whether any factual findings are supported by competent, material, and substantial evidence on the whole record. Const 1963, art 6, § 28; *MCI Telecommunications Corp v Dep't of Treasury,* 136 Mich App 28, 30; 355 NW2d 627 (1984), lv den 422 Mich 883 (1985). Penney contends here that the tribunal's decision is not supported by competent, material, and substantial evidence on the whole record.

## THE SINGLE BUSINESS TAX ACT

The Michigan Single Business Tax Act, MCL 208.1 *et seq.*; MSA 7.558(1) *et seq.*, does not impose an income tax, but rather a tax on the privilege of conducting business activity in this state. However, the act uses federal taxable income as a starting point in the calculation of the tax base upon which the single business tax is levied. Thus, under the act, "tax base" means "business income" subject to adjustments, MCL 208.9(1); MSA 7.558(9); business income means "federal taxable income," MCL 208.3; MSA 7.558(3); and federal taxable income means taxable income as defined in § 63 of the Internal Revenue Code, MCL 208.5; MSA 7.558(5).

Since the nature of the federal income tax and the single business tax are fundamentally different, it is necessary to adjust federal taxable income in order to arrive at the tax base for single business tax purposes. Those adjustments are set out in § 9 of the act, MCL 208.9; MSA 7.558(9). Subsection (7) is of importance here. Under this subsection, the single business taxpayer *deducts* interest income from business income to the extent such interest income is included in determining the taxpayer's federal tax liability. It is this adjustment that lies at the heart of the present dispute.

Penney says it is entitled to the adjustment reducing business income because the interest income from customer charge card accounts was *its* income (not Financial's) and that income was properly reported on Penney's federal corporate income tax returns.

The department responds, and the tribunal held, that Penney is not entitled to the adjustment because the interest income was not Penney's, but rather Financial's; that Penney's sale of customer obligations to Financial included both past balances and the right to future interest; that to the extent Penney collects such interest it is acting as agent for Financial; and that the federal income tax returns of Penney are not dispositive since Penney and Financial file consolidated federal returns.

We agree with Penney and hold that the tribunal's decision is not supported by competent, material, and substantial evidence on the whole record and we therefore reverse.

### THE DECISION

To claim the subsection (7)(b) adjustment, a

single business taxpayer must show that the income was "interest," that it was paid or payable to the taxpayer, and that it was included in determining the taxpayer's federal income tax liability.

The Single Business Tax Act does not define "interest." However, our Supreme Court has interpreted the term to mean

> compensation allowed by law or fixed by the respective parties for the use or forbearance of money, "a charge for the loan or forbearance of money," or a sum paid for the use of money, or for the delay in payment of money. [Citations omitted.] [*Town & Country Dodge, Inc v Dep't of Treasury,* 420 Mich 226, 242; 362 NW2d 618 (1984).]

The department in this case does not deny the adjustments in dispute relate to monies that are "interest." The first requirement is met.

Likewise, the department does not dispute that the interest was included by Penney in determining and reporting its federal income tax liability. Although the department asserts that this fact is not dispositive since Penney and Financial file consolidated returns, there is no question that the interest was "included in arriving at federal taxable income" as required by MCL 208.9(7); MSA 7.558(9)(7).

The third requirement, contested in the tribunal and here, is whether the interest was Penney's or Financial's. Penney says the interest was paid to it and the department says Penney collected it for the benefit of Financial, to which the customer accounts, including interest collected after transfer, were sold.

As noted earlier, we conclude that Penney transferred to Financial only accrued amounts, for principal and unpaid interest, due it as of the date of

transfer and did not sell the right to receive interest in the future. Subsequently, accruing interest was Penney's property unless and until it was later transferred to Financial. Penney sold monies owed it without specification as to principal and interest because the monies lost their distinct identities prior to transfer. This view is supported by the evidence presented to the tribunal and that body's contrary conclusion is without foundation in the record presented it and us.

First, the agreement between Penney and Financial compels this result. Penney agreed to sell Financial "customer obligations," which were defined as

the total recorded unpaid amount of the obligations (including assessed finance charges) of a customer under a Credit Agreement, whether or not all or part of such obligations shall have been conveyed to you hereunder, but such term shall not include [defaulted obligations and obligations sold to third parties].

With regard to the sale of such obligations, the agreement provided:

[At agreed times] we [Penney] will convey to you [Financial], and you will purchase, as hereinafter provided, all our right, title and interest in and to such dollar amount of Customer Obligations (not theretofore conveyed to you) outstanding as of the end of the last complete Accounting Period as shall be specified in the instrument effecting such conveyance.

The agreement patently contemplates the sale of accounts in an ascertainable dollar amount. That result can only be achieved by the transfer of principal and interest charges already accrued and

billed to the customer accounts. Future interest at the time of the transfer is necessarily speculative, uncertain in amount and not subject to the agreement.

Second, accounting and auditing experts for *both* the taxpayer and the department testified that the agreement and practice of the parties did not convey Penney's right to receive future interest. Such interest remained the property of Penney unless and until transferred to Financial. All Penney sold was a customer obligation representing a total debt due Penney as of the date of transfer. The right to receive interest on the principal portion of that debt was not transferred to Financial.

Third, Penney's dealings with others who provided financing is persuasive evidence establishing that future interest was not sold to Financial. On a single occasion in 1980, Penney sold its customer credit obligations to a third party, Citicorp Industrial Credit Corporation. Under the Citicorp agreement, Penney sold a complete billing cycle consisting of specifically identified customer accounts. All accounts in that cycle were transferred along with all rights concerning those accounts, including the right to receive future interest charges. Unlike the Financial agreement, the Citicorp contract defined "receivable" as

> the indebtedness of an Obligor pursuant to a Contract to make payments (in u. s. dollars) as the result of the purchase of Goods, plus the obligation, if any, to pay future finance charges with respect thereto.

The Penney-Financial agreement, the expert testimony, and this third-party transaction all compel the conclusion that Penney did not transfer the

right to receive future interest to Financial, that such interest was income to Penney, and that such interest income—having been reported on Penney's federal return—was properly deducted in determining Penney's Single Business Tax Act base under MCL 208.9(7); MSA 7.558(9)(7).

The tribunal's erroneous conclusion to the contrary was largely based on two provisions in the receivables agreement. The tribunal concluded:

> Penney Company transferred to Financial Corp. their entire right, title, and interest in the conveyed customer receivables as well as the proceeds of collections which includes interest.

The finding was premised, in part, on paragraph 5 of the agreement relating to representations and warranties, which states:

> We hereby represent and warrant to you as follows:
>
> * * *
>
> (c) each instrument of conveyance executed and delivered to you by us hereunder will convey to you our entire right, title and interest in and to the Conveyed Customer Obligations covered by such instrument and the proceeds of collection thereof, in each case free and clear from claims of any third parties, except to the extent of any actions or infirmities on your part . . . .

The tribunal therefore based its finding that Penney transferred its entire right, title, and interest in the *"conveyed customer receivable,"* which "includes interest," on the statement in the warranty section of the agreement which addressed conveyance of Penney's "entire right, title and interest in and to the *Conveyed Customer Obligations."* However, customer receivables and

customer obligations are not synonymous. The latter was created and defined by contract between Penney and Financial and constituted an interest in an intangible which was less than an entire account receivable. The tribunal erred in equating the two.

Likewise, the tribunal erred in concluding that the termination provisions of the agreement supported a finding that future interest was transferred. Those provisions state:

> 11. *Termination.* This Agreement (except as it relates to Conveyed Customer Obligations and Conveyed Defaulted Obligations owned and not reconveyed by you on the effective date of termination) may be terminated by either party hereto by giving the other party prior written notice of such termination. No such termination shall affect any rights of the parties accruing up to the date of such termination.

Furthermore, the third unnumbered paragraph under provision 6 of the agreement states in pertinent part:

> In giving notice of termination pursuant to paragraph 11 hereof, . . . you may by written notice revoke all or any of our authority under this paragraph 6 with respect to Conveyed Customer Obligations and Conveyed Defaulted Obligations, and, upon request in writing from you, unless we shall have repurchased Conveyed Customer Obligations and conveyed Defaulted Obligations . . . (i) we shall at our own cost and expense, promptly notify . . . all customers whose Conveyed Customer Obligations and Conveyed Defaulted Obligations are outstanding on the effective date of such termination of your ownership of Your Share thereof . . ., instructing said customers thereafter to make payments of said portion of their then existing Conveyed Customer Obligations and Con-

veyed Defaulted Obligations to you or to whomsoever you may designate, (ii) all bills thereafter rendered by us to customers with respect to Conveyed Customer Obligations and Conveyed Defaulted Obligations outstanding on the effective date of such termination shall, to the extent practicable, show separately the proportion of each payment and of the aggregate obligation to be paid by each customer to each of you and us, respectively.

Thus, although Financial had the right to terminate the agreement prospectively and have Penney customers pay them directly, those payments would only include amounts owed to Financial (equal to principal and assessed interest), and not the accumulated interest owed to Penney. This is evident from the clause "to the extent practicable, show separately the proportion of each payment and of the aggregate obligation to be paid by each customer *to each of you and us, respectively.*" Apparently the tribunal neglected to consider this clause. Thus, its statement that "payment by the customer would include the principal and outstanding interest" was not supported by the record.

If Penney had chosen to sell its entire interest in its customer accounts receivable, including all future interest accumulated, rather than selling only the "customer obligation," as of a particular date, it could have entered into an agreement with Financial similar to the one it entered into with Citicorp.

CONCLUSION

Penney did not transfer to Financial the right to receive future interest. Interest accrued prior to

any transfer was income to Penney for federal tax purposes and was therefore deductible by Penney in computing its Single Business Tax Act liability.
  Reversed.