ANSELL v DEPARTMENT OF COMMERCE (ON REMAND)

Docket No. 187751. Submitted January 22, 1997, at Lansing. Decided March 14, 1997, at 9:40 A.M.

Harold S. Ansell, Jr., petitioned the Kalamazoo Circuit Court for judicial review of a decision by the Department of Commerce, Board of Examiners of Mortuary Science, to revoke his mortician's license after the board concluded that the petitioner obtained his license by fraud or deceit and demonstrated a lack of good moral character, MCL 339.604(a),(d); MSA 18.425(604)(a),(d), in that he had falsely certified that he had embalmed, or assisted a licensed mortician in embalming, twenty-five dead human bodies for burial or shipment during his resident training, MCL 339.1808(3); MSA 18.425(1808)(3). The court, J. Richardson Johnson, J., affirmed the decision of the board. The Court of Appeals denied the petitioner leave to appeal. The Supreme Court, in lieu of granting leave to appeal, remanded the case to the Court of Appeals for consideration as on leave granted. 449 Mich 893 (1995).

On remand, the Court of Appeals *held*:

1. The board's determination that the petitioner obtained his license by fraud or deceit and demonstrated a lack of good moral character is supported by competent, material, and substantial evidence. Section 1808(3) requires prospective morticians during their resident training to embalm or participate in embalming twenty-five dead human bodies. This requirement is not satisfied where, as here, a prospective mortician merely performs administrative and funeral-related tasks such as procuring clergy, arranging flowers, ushering mourners, preparing obituaries, cosmetically modifying embalmed corpses, selling funeral merchandise, or positioning bodies in caskets. Contrary to what was indicated in the embalming reports he submitted for licensure, the petitioner admitted that he had not participated in at least seventeen of the reported twenty-five embalmings and that two licensed morticians he had reported to have assisted in embalmings did not perform them.

2. The four-year period between the issuance of a formal complaint against the petitioner and the contested case hearing does not represent undue delay that gives rise to a denial of due process of law. The petitioner does not claim dilatory conduct by the

respondent, and the petitioner caused some of the delay, benefited from retaining his license until the hearing, and was not prejudiced by the delay.

3. Error by the circuit court, if any, in expanding the administrative agency record was harmless in light of the circuit court's statement that it did not rely on new information.

Affirmed.

1. LICENSES — MORTICIAN'S LICENSE — RESIDENT TRAINING — EMBALMING REQUIREMENT.

An applicant for a mortician's license must, during resident training, embalm, or assist a licensed mortician in embalming, twenty-five dead human bodies; this requirement is not satisfied where a prospective mortician merely procures clergy, arranges flowers, ushers mourners, prepares obituaries, cosmetically modifies embalmed corpses, sells funeral merchandise, or positions bodies in caskets (MCL 339.1808[3]; MSA 18.425[1808][3]).

2. ADMINISTRATIVE LAW — CONTESTED CASES — HEARINGS.

Parties to a contested case are entitled to a hearing without undue delay; considered in determining whether delay constitutes a denial of procedural due process are the private interest at stake, the risk of an erroneous deprivation of such interest through the procedures used, the probable value of additional or substitute procedures, and the state or governmental interest, including the function involved and the fiscal or administrative burdens imposed by substitute procedures (MCL 24.271[1]; MSA 3.560[171][1]).

*Willingham & Coté, P.C.* (by *Curtis R. Hadley*), for the petitioner.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Michael A. Lockman* and *R. Francis Rose*, Assistant Attorneys General, for the respondent.

ON REMAND

Before: GRIFFIN, P.J., and MCDONALD, and C. W. JOHNSON*, JJ.

_____

* Circuit judge, sitting on the Court of Appeals by assignment.

GRIFFIN, P.J. Petitioner, Harold S. Ansell, Jr., appeals as on leave granted the circuit court's order affirming an order of respondent, Department of Commerce, Board of Examiners of Mortuary Science, revoking his license to practice mortuary science. We affirm and hold that the board correctly construed MCL 339.1808(3); MSA 18.425(1808)(3) to require prospective morticians to embalm or participate in embalming twenty-five dead human bodies during the prescribed resident training period.

I

After obtaining the requisite accreditation, completing a resident training program under the tutelage of his father, Harold Ansell, Sr., and passing required national and state examinations, petitioner obtained a license to practice mortuary science in March 1988.[1] In qualifying for licensure, petitioner was obliged to complete the resident training prescribed in § 1808 of the Occupational Code, MCL 339.101 *et seq.*; MSA 18.425(101) *et seq.* Section 1808(3), MCL 339.1808(3); MSA 18.425(1808)(3), requires prospective licensees to either embalm or assist a licensed mortician "in supervising the preparation of 25 dead human bodies for burial or transportation during the period of resident training." In proving compliance with § 1808, petitioner submitted twenty-five "EMBALMING REPORT" forms to the former Department of Licensing and

---

[1] Petitioner began working and performing various funeral-related tasks for the Truesdale Funeral Home in 1970. Three years later, petitioner attended mortuary science college for roughly one year. However, petitioner did not seek a mortuary science license until 1987, approximately the time his father, Truesdale's owner and chief operator, began suffering the effects of a degenerative disease.

Regulation (MDLR).[2] In completing each report, petitioner identified the subject corpse, detailed the body's preembalming condition, described the embalming procedure, and listed various other administrative details to which he attended.[3] By signing each report, petitioner attested to having "personally embalmed or assisted in the preparation of this case." Additionally, either his father or trade embalmer James Lucius signed the embalming reports in the space provided for the "[e]mbalmers signature, if other than the sponsor." Each form states: "No credit will be given for any case where embalming was not performed, i.e., ship-ins[4], immediate cremations or burials, or body donations."

In March 1988, the MDLR received a complaint that the Truesdale Funeral Home was conducting funerals without the supervision of a licensed mortician.[5] A subsequent investigation disclosed that petitioner had neither embalmed nor participated in embalming several of the cases for which he claimed credit as a resident trainee. This investigation also revealed discrep-

---

[2] The MDLR no longer exists as a department of state government. By executive order, the Governor transferred all the statutory authority, powers, duties, functions, and responsibilities of the MDLR to the Michigan Department of Commerce. Executive Order No. 1991-9, 1991 MR 2, pp 53-57. The former MDLR is now the Bureau of Occupational and Professional Regulation, Michigan Department of Commerce.

[3] Examples of these details include: removing the corpse from the place of death, arranging for clergymen, arranging flowers, receiving visitors, selling funeral merchandise, arranging cemetery details, and seating relatives or parking cars at the funeral.

[4] Roger Beebe, a licensed mortician and MDLR investigator, testified that the term "ship-in" refers to a body already prepared for burial that is received from another funeral home.

[5] The apparent basis for the complaint was that after petitioner's father developed Lou Gehrig's disease, he was too ill to attend all of Truesdale's funerals.

ancies in the petitioner's embalming reports, including several instances where the person attesting to embalming the case was not the actual embalmer. Thereafter, on August 2, 1989, the MDLR prepared a formal complaint charging petitioner with several violations of the Occupational Code.

At a settlement/compliance conference held on September 20, 1989, the parties tentatively agreed to settle the case. However, petitioner's attorney requested some amendments of the written settlement agreement, and the MDLR redrafted and remailed the proposed agreement in October 1989. Because petitioner's attorney requested three weeks to review the revised proposal, the board could not review the proposed settlement at its November 28, 1989, meeting. Accordingly, the board did not consider the proposed agreement until its next meeting. At its meeting held on February 8, 1990, the board rejected the proposed settlement. Thereafter, on December 17, 1991, the MDLR scheduled a formal hearing for January 8, 1992. Upon petitioner's request, the hearing was adjourned until February 11, 1992. On that date, the Administrative Law Examiner (ALE) rejected petitioner's multiground motion to dismiss and scheduled a contested case hearing for May 1, 1992.

Testifying during the state's case in chief, petitioner admitted that his father had not embalmed any of the bodies identified on petitioner's embalming reports. Additionally, Mr. Lucius testified that he was mistaken in signing six of petitioner's embalming reports because he never embalmed the identified bodies. Petitioner explained, however, that he was unaware that embalming reports required an embalmer's signature because an MDLR staffer told him that his spon-

sor's name could be used in place of the embalmer. Moreover, petitioner agreed that he did not participate in embalming at least seventeen of the twenty-five bodies identified in the submitted embalming reports.[6] Nevertheless, petitioner testified that he thought he had "personally . . . assisted in the preparation of [each] case[]" by performing administrative and funeral-related tasks such as procuring clergy, arranging flowers, ushering mourners, preparing obituaries, cosmetically modifying embalmed corpses, selling funeral merchandise, and positioning bodies in caskets.

The state countered petitioner's interpretation with testimony from several licensed morticians, who each explained that "preparation for burial" is a term of art that mortuary scientists use synonymously with the phrase "act of embalming." Each testifying licensee concluded that body preparation means services performed on dead bodies, not tasks connected with funerals. Additionally, two MDLR/commerce department staffers testified that the board has historically construed the resident training requirement in § 1808(3) to mandate twenty-five embalmings and that applications for mortuary science licenses would be rejected if they knew the applicant had not participated in any embalmings.

In a comprehensive written opinion, the ALE construed § 1808 to require resident trainees to person-

[6] Jerry Oele, a licensed mortician and owner of a competing funeral home, testified that, without petitioner's participation, either he or his assistant embalmed and prepared four of the twenty-five bodies petitioner named in the case reports. Additionally, Martha Redman-Cox and Thomas Coleman, both mortuary science licensees, each testified that, without petitioner's help, they embalmed four and nine, respectively, of the bodies identified in petitioner's case reports.

ally embalm or assist in embalming twenty-five dead human bodies. The ALE thus concluded that petitioner misled the MDLR by submitting embalming reports on bodies he did not help to embalm.[7] Consequently, the ALE found that petitioner violated MCL 339.604(a) and (d); MSA 18.425(604)(a) and (d) by obtaining his mortician's license through fraud or deceit and by demonstrating a lack of good moral character.[8] On the basis of these findings, the board voted to revoke petitioner's license to practice mortuary science. The board served petitioner a final order revoking his mortician's license on December 29, 1992.

Petitioner appealed the board's decision to the circuit court, which affirmed. This Court denied petitioner's application for leave to appeal in Docket No. 177001. In lieu of granting leave to appeal, our Supreme Court remanded this matter to this Court for consideration as on leave granted. *Ansell v Dep't of Commerce*, 449 Mich 893 (1995).

---

[7] However, the ALE concluded that the state failed to meet its burden of proving that petitioner supervised two funerals in violation of MCL 339.601(1); MSA 18.425(601)(1). Also, the ALE determined that the state failed to prove that petitioner violated MCL 339.604(b); MSA 18.425(604)(b) by employing fraud, deceit, or dishonesty while practicing as a licensed mortician.

[8] Section 604 provides, in pertinent part:

A person who violates 1 or more of the provisions of an article which regulates an occupation or who commits 1 or more of the following shall be subject to the penalties prescribed in section 602:

(a) Practices fraud or deceit in obtaining a license or certificate of registration.

\*    \*    \*

(d) Demonstrates a lack of good moral character. [MCL 339.604(a),(d); MSA 18.425(604)(a),(d).]

II

On appeal, petitioner contends that the circuit court erred in affirming the board's order that revoked his license to practice mortuary science. We disagree. We review the factual findings of administrative agencies to determine whether they are supported by competent, material, and substantial evidence on the whole record. Const 1963, art 6, § 28; *Amalgamated Transit Union, Local 1564, AFL-CIO v Southeastern Michigan Transportation Authority*, 437 Mich 441, 450; 473 NW2d 249 (1991); *Employment Relations Comm v Detroit Symphony Orchestra, Inc*, 393 Mich 116, 124; 223 NW2d 283 (1974). We will set aside an administrative agency's legal ruling only if it violates the constitution or a statute or is affected by a "substantial and material error of law." MCL 24.306(1)(a), (f); MSA 3.560(206)(1)(a),(f); *Amalgamated Transit Union, supra* at 450; *Southfield Police Officers Ass'n v Southfield*, 433 Mich 168, 175-176; 445 NW2d 98 (1989). Although administrative agencies may not eschew the plain meaning of a statute, we afford considerable weight to the statutory construction made by the agency charged with the execution of a statute. *Ludington Service Corp v Acting Comm'r of Ins*, 444 Mich 481, 490; 511 NW2d 661 (1994), amended 444 Mich 1240 (1994); *Magreta v Ambassador Steel Co*, 380 Mich 513, 519; 158 NW2d 473 (1968).

The dispositive issue presented is whether § 1808(3) mandates prospective mortuary scientists to embalm or participate in embalming twenty-five dead human

bodies.[9] In addressing this issue, we are mindful that
" '[t]he fundamental purpose of any rule of statutory
construction, of course, is to assist the court in dis-
covering and giving effect to the intent of the Legisla-
ture.' " *Terzano v Wayne Co*, 216 Mich App 522, 526-
527; 549 NW2d 606 (1996), quoting *In re Certified
Question*, 433 Mich 710, 722; 449 NW2d 660 (1989).
Once discovered, the Legislature's intent must prevail,
any existing rule of construction to the contrary not-
withstanding. *In re Certified Question, supra* at 722;
*Terzano, supra* at 527. Where reasonable minds may
differ about the meaning of the statute, we look to
the objective of the statute and the harm it is
designed to remedy and apply a reasonable construc-
tion that best accomplishes the Legislature's purpose.
*Terzano, supra* at 527; *People v Ward*, 211 Mich App
489, 492; 536 NW2d 270 (1995). In discovering legisla-
tive purpose, statutes relating to the same subject or
sharing a common purpose are in pari materia and
must be read together. *Jennings v Southwood*, 446
Mich 125, 136; 521 NW2d 230 (1994); *State Treasurer
v Schuster*, 215 Mich App 347, 352; 547 NW2d 332
(1996); *Feld v Robert & Charles Beauty Salon*, 174
Mich App 309, 317; 435 NW2d 474 (1989), rev'd on
other grounds 435 Mich 352; 459 NW2d 279 (1990).
Finally, we avoid any construction that renders any
statutory language surplusage, nugatory, absurd, or
illogical. *Marquis v Hartford Accident & Indemnity
(After Remand)*, 444 Mich 638, 644; 513 NW2d 799
(1994); *Altman v Meridian Twp*, 439 Mich 623, 635;
487 NW2d 155 (1992); *Ward, supra* at 492.

---

[9] We express no opinion whether the resident training required in
§ 1808(3) may be satisfied in circumstances where the trainee physically
prepares for burial a body that will not be embalmed.

Recognizing the important public safety issues involved in properly treating human remains, the portion of the Occupational Code pertaining to mortuary science (mortuary science act), MCL 339.1801; MSA 18.425(1801) through MCL 339.1812; MSA 18.425(1812), carefully precludes unlicensed individuals from funeral directing, embalming, or otherwise preparing human corpses for burial and transportation. MCL 339.1804(1); MSA 18.425(1804)(1), MCL 339.1803; MSA 18.425(1803). To ensure the competence of those practicing these critical tasks, §§ 1801(b) and 1806(1) establish a "resident training" period as a prerequisite to procuring a license to practice mortuary science. To complete resident training, prospective licensees are required by § 1808(3) to

> present, in connection with the other evidence required by this article, a statement from each holder of a license to practice mortuary science under whom the trainee has trained, showing that the trainee *has embalmed for burial or shipment at least 25 dead human bodies, or has assisted the holder of a license for the practice of mortuary science in supervising the preparation of 25 dead human bodies for burial or transportation during the period of resident training.* A resident trainee shall meet *other training or requirements as may be required by rules of the department and the board.* [Emphasis added.]

Petitioner contends that because the phrase "preparation of 25 dead human bodies for burial or transportation" is separated from the term "embalm" with the disjunctive "or," resident trainees can satisfy § 1808(3) without participating in any embalmings. Petitioner adds that § 1801(e) defines the "practice of mortuary science" as encompassing either "embalming" or "funeral directing," and he argues that morti-

cians without embalming aspirations can satisfy § 1808(3) by performing tasks appurtenant to funerals, such as ushering funeral guests, preparing obituaries, and positioning and grooming embalmed bodies. We are not persuaded by petitioner's isolated, noncontextual construction of the mortuary science act. In our view, a reading of the act in pari materia reveals a legislative emphasis on the safe, sanitary treatment of human remains, not the ability to competently perform tasks related to an orderly, ceremonious burial.

As we observed in *Espinoza v Bowerman-Halifax Funeral Home*, 121 Mich App 432, 437; 328 NW2d 657 (1982), the mortuary science act focuses on "what is to be done or not done with a dead human body." The act is replete with references to embalming and chemically treating human corpses and devoid of stipulations concerning ceremonial memorial proceedings. Therefore, we conclude that the Legislature enacted the mortuary science act to regulate the science of treating human remains. In this context, the language in § 1808(3) regarding "the preparation of . . . dead human bodies for burial" is properly construed as pertaining to the scientific process by which human bodies are embalmed and treated for safe disposal, not the unscientific tasks involved in administering funeral services. In other words, to remain consistent with the treatment-oriented character of the mortuary science act, we construe the term "preparation" in § 1808(3) as synonymous with the word "treat" in the standard definition of "embalm," which is "to *treat* (a dead body) so as to preserve it, as with chemicals, drugs, or balsams." *Random House Web-*

ster's *College Dictionary, Revised Edition* (1991) (emphasis added).

Moreover, petitioner's attempt to obtain a mortuary science license without demonstrating embalming proficiency is inconsistent with § 1805, which affords licensed mortuary scientists authority to

> disinfect or preserve a dead human body, entirely or in part, by the use of a chemical substance, fluid, or gas in the body of by the introduction of a chemical, substance, fluid, or gas into the body by a vascular or hypodermic injection, or by direct application into an organ or cavity in preparation for burial or disposal. The person may direct the burial or disposal of a dead human body and may maintain a funeral establishment for the preparation and disposition, or for the care of a dead human body . . . .

Because licensees have authority to embalm, logic dictates that resident training must entail practical embalming experience. Granting embalming authority to licensees who attempt to achieve licensure by seating and ushering funeral guests, positioning and grooming bodies in a casket, selling funeral merchandise, or summarizing death certificates would not further the Legislature's goal of protecting public health. Thus, although § 1801(e) defines the practice of mortuary science as involving "the practice of embalming, or the practice of funeral directing, or both," the absence of any means for obtaining a license exclusive to funeral directing implies a legislative requirement that all funeral directors possess embalming experience. Otherwise, the potential exists that unwitting funeral directors will supervise burials of improperly embalmed bodies.

Further, even if the embalming requirements were not apparent to petitioner from his reading of the

statute, petitioner was placed on notice of the necessity of this experience by the MDLR reports that he submitted. Each required embalming report stated that petitioner would receive no credit unless the identified body was embalmed where petitioner was undergoing resident training. In completing each report, petitioner had to provide significant information about the body and the embalming process. Further, petitioner was required to identify the embalmer and certify that petitioner "personally embalmed or assisted in the preparation of this case." These embalming-related requirements would be unnecessary and illogical unless applicants were required to participate in embalming the body identified in the report. Thus, even if § 1808(3) were ambiguous, the embalming reports submitted by petitioner clearly bound him to the embalming requirement because § 1808(3) requires applicants to fulfill "other training requirements as may be required by rules of the department and the board."

Accordingly, consistent with the purpose of the mortuary science act, the board's express requirements, and the board's reasonable construction of the statute that it administers, we hold that petitioner was obligated to personally embalm or assist in embalming twenty-five bodies as a condition of his licensure. Because the record is clear that petitioner thwarted this requirement and misidentified the true embalmer of some of the bodies at issue, we find competent, material, and substantial evidence to support the board's determination that petitioner

obtained his license by fraud or deceit and demonstrated a lack of good moral character.[10]

### III

Petitioner also claims that the almost four-year gap between the issuance of the formal complaint and the contested case hearing denied him due process of law. We disagree. Only in postrevocation hearings is it required that contested case hearings be "promptly commenced and determined." MCL 24.292; MSA 3.560(192); see, generally, *Cleveland Bd of Ed v Loudermill*, 470 US 532; 105 S Ct 1487; 84 L Ed 2d 494 (1985). Where, as here, the subject of the proceedings retains his license, MCL 24.271(1); MSA 3.560(171)(1) provides: "The parties to a contested case shall be given an opportunity for a hearing without undue delay." In determining "undue delay," we use a balancing test to discern whether plaintiff was denied procedural due process. In *Dobrzenski v Dobrzenski*, 208 Mich App 514, 515; 528 NW2d 827 (1995), this Court summarized this standard as follows:

> " 'Due process applies to any adjudication of important rights.' " *In re Brock*, 442 Mich 101, 110; 499 NW2d 752 (1993), quoting *In re LaFlure*, 48 Mich App 377, 385; 210 NW2d 482 (1973). It is a flexible concept calling for " 'such procedural protections as the particular situation demands.' " *Brock*, p 111, quoting *Mathews v Eldridge*, 424 US 319, 334; 96 S Ct 893; 47 L Ed 2d 18 (1976). Due process requires fundamental fairness, which involves consideration

---

[10] The phrase "good moral character" as used in § 604(d) is defined in § 104(7), which adopts the definition in MCL 338.41; MSA 18.1208(1). The phrase "good moral character" means the licensee's propensity to serve the public in the licensed area in a fair, honest, and open manner. MCL 338.41(1); MSA 18.1208(1)(1).

of the private interest at stake, the risk of an erroneous deprivation of such interest through the procedures used, the probable value of additional or substitute procedures, and the state or governmental interest, including the function involved and the fiscal or administrative burdens imposed by substitute procedures. *Brock*, p 111, citing *Mathews*, p 335.

See also *People v Sierb*, 219 Mich App 127, 134; 555 NW2d 728 (1996); *Jordan v Jarvis*, 200 Mich App 445, 448-449; 505 NW2d 279 (1993); *In re Konke Estate*, 98 Mich App 249, 253; 296 NW2d 226 (1980).

The proceedings in this case were not fundamentally unfair. Petitioner makes no claim that the delay between the issuance of the complaint and the evidentiary hearing was the result of dilatory conduct on the part of the board. To the contrary, petitioner is partially responsible for any delay because he requested adjournments and spent so much time reviewing the proposed settlement that the board was unable to consider it at its next scheduled meeting. Additionally, petitioner made no attempt to expedite the resolution of the case, never complained about the delay, and actually benefited therefrom by retaining his unrestricted license until his hearing. Compare *Cleveland Bd of Ed, supra.* We reject petitioner's unsupported claim that he was prejudiced by his ailing father's inability to testify. Assuming that petitioner's father would have been able to testify at an earlier hearing, petitioner fails to establish how such testimony would have benefited his case. It appears clear that petitioner's father's testimony would not change the result in light of the fact that petitioner conceded the facts that ultimately led to the revocation of his license. Nonetheless, petitioner could have

preserved his father's testimony under MCL 24.280(1)(b) and (c); MSA 3.560(180)(1)(b) and (c). Given these circumstances, we find no error arising from the delay.

IV

Finally, we reject petitioner's claim that the circuit court committed error requiring reversal by allowing respondent to expand the agency record on appeal. Assuming arguendo that the record was improperly expanded, petitioner was not prejudiced. The court stated that it did not rely on the new information and, instead, that "the Court relied on the analysis of the case law and general experience in both legal and administrative proceedings in reaching the conclusions set forth in the decision." See, e.g., *Jordan, supra.* Therefore, the error, if any, in the expansion of the record before the circuit court was harmless.

Affirmed.