ANR PIPELINE COMPANY v DEPARTMENT OF TREASURY

Docket No. 249056. Submitted April 5, 2005, at Lansing. Decided May 3, 2005, at 9:10 a.m. Leave to appeal sought.

ANR Pipeline Company petitioned the Michigan Tax Tribunal to review final assessments issued by the Department of Treasury under the Single Business Tax Act (SBTA), MCL 208.1 *et seq*. The assessments related to the petitioner's attempts under MCL 208.9(7)(b) to exclude from its single business tax base payments received that the petitioner characterized as interest income on its federal income tax returns, but which the respondent concluded were actually more in the nature of carrying charges. The Federal Energy Regulatory Commission (FERC) had authorized the petitioner to charge these amounts to certain customers to recover a portion of the petitioner's costs for settling past breach-of-contract claims against it. The tribunal found in favor of the respondent, concluding that the payments in question were essentially revenue, rather than interest, and should not be excluded from the petitioner's single business tax base. The petitioner appealed.

The Court of Appeals *held*:

1. The SBTA provides for interest a taxpayer receives to be excluded from the taxpayer's single business tax base. The SBTA does not define "interest." A number of considerations in this case, however, indicate that the payments in question were not interest, including the fact that there were no contracts with fixed interest terms or specific payments due. The amounts charged were based on the quantity of gas a customer used or transported, and no customer was obligated to take or transport a specific amount of gas. There was no opportunity for a customer to escape the so-called "interest component" of the charge by immediate payment of a principal amount. There were also no fixed debtors. The fact that the Internal Revenue Service allowed the petitioner to characterize the payments as interest income is immaterial to proper characterization of the charges under the SBTA. Furthermore, the petitioner did not treat the charges as interest in billing its customers, who would have then been obligated to add those amounts to their own single business tax bases. Moreover, the petitioner is not in the commercial lending industry. The sub-

stance of the transaction controls. The "interest" payments were in actuality a means to recover settlement amounts authorized by the FERC in a manner that corrected a competitive imbalance in the regulated gas transmission industry and did not further disadvantage the petitioner. The payments were designed to act as revenue in the petitioner's hands. Including them in the petitioner's single business tax base is consistent with the purposes of the SBTA as a value-added tax.

2. Collateral estoppel does not apply to this case because the actual question of whether the payments are interest was never raised and decided in the proceedings before the FERC. Nor does res judicata apply. While the Public Service Commission (PSC) intervened in a FERC action, the petitioner has not shown that the PSC had the authority to represent the state's interest in collecting taxes in that proceeding, and the PSC and the respondent do not share the identical interests necessary for res judicata to apply to this case. Nor has the petitioner shown that the FERC had the jurisdiction or authority to resolve the issue of how the payments should be characterized under the SBTA.

Affirmed.

TAXATION — SINGLE BUSINESS TAX — INTEREST — PIPELINE COMPANY SURCHARGES

A surcharge, authorized by the Federal Energy Regulatory Commission to allow a pipeline company to recover a portion of its costs for settling past breach-of-contract claims against it by passing them on to customers purchasing or transporting gas in the future, is not interest that is deductible from the pipeline company's single business tax base when calculating that company's single business tax liability (MCL 280.9[7][b]).

*Mika Meyers Beckett & Jones, PLC* (by *Jeffrey A. DeVree* and *Elizabeth K. Bransdorfer*), and *D. Glen Eisen* for the petitioner.

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Kevin T. Smith*, Assistant Attorney General, for the respondent.

Before: CAVANAGH, P.J., and JANSEN and GAGE, JJ.

PER CURIAM. Petitioner ANR Pipeline Company appeals as of right an opinion and judgment of the

Michigan Tax Tribunal. Petitioner unsuccessfully sought to exclude certain portions of its income in fiscal years 1989 through 1994 from taxation pursuant to the Single Business Tax Act (SBTA), MCL 208.1 *et seq*. We affirm.

## I. FACTS

Petitioner is a Michigan corporation engaged in the interstate transportation, storage, and sale of natural gas. This claim arose from petitioner's attempt to exclude from its single business tax (SBT) base certain charges to its customers that it characterized as "interest income." In three separate final assessments, respondent asserted that the amounts in question were not interest income to petitioner, but were more akin to "carrying charges," which should be included in the SBT base. The Tax Tribunal agreed with respondent.

Petitioner's gas sales services generally involves the purchase of gas, the transportation of that gas through petitioner's pipelines, and the sale of that gas to local distribution companies and large industrial customers. Petitioner also maintains storage fields, and sells stored gas to customers during periods of peak demand. This industry is regulated by the Federal Energy Regulatory Commission (FERC).[1] The maximum allowable rates, as well as general conditions of service, are determined through general rate case proceedings and set out in FERC-approved tariffs. Customers and other interested parties may intervene in these proceedings.

In the 1970s, gas shortages existed, and the FERC instituted policies designed to provide some guarantee of a gas inventory at a time when the commodity was

---

[1] Power to regulate was transferred to FERC from its predecessor, the Federal Power Commission, in 1977.

difficult to obtain. In response, pipeline companies executed long-term "take-or-pay" contracts that required them to either "take" a specified amount of gas or "pay" for the equivalent amount whether taken or not. Pipeline companies could, and did, pass increased costs along to their customers. However, because of further FERC intervention, pipeline companies lost the ability to pass on these costs. At the same time, a "spot" market developed, whereby gas customers could buy gas for much cheaper than they could purchase it from the pipeline companies. The pipeline companies were then forced to transport this gas. As a result, some companies, including petitioner, were placed at a considerable competitive disadvantage. These companies could not take the minimum quantities of gas for which they had contracted, and were forced to breach the take-or-pay contracts with producers. This led to litigation.

Ultimately, the natural gas producers and pipeline companies settled the take-or-pay claims. In order to avoid a catastrophe in the industry, in a series of rulings, the FERC allowed the pipeline companies to recover some of these settlement costs by passing them on to future (volumetric-surcharge) customers or by billing the costs back to previous (direct-billing) customers. Different amounts could be recovered depending on the system or systems used. Petitioner chose to utilize both methods of recovery. As a result, the direct-billing customers, who had a preexisting contractual relationship with petitioner (and who continued to be petitioner's customers), were "back-billed" for their share of the payments, which were apparently based on the fact that their past reduced gas purchases had contributed to the take-or-pay liability. For volumetric-surcharge customers, who now included all new and preexisting customers, a "volumetric surcharge" was

added to the sales price of *additional* gas sold or transported by petitioner as a set amount per unit of gas transported or sold.[2]

The FERC allowed this volumetric-surcharge payment to include what petitioner describes as an interest component, with interest tied to FERC-controlled rates. See 18 CFR 2.104. For the direct-billing customers who elected not to pay their preexisting obligations in full, the invoices sent to the customers contained an actual breakdown of the principal and interest components.[3] However, petitioner admits that it did not similarly "break out" the VSCC included in each new gas invoice "because customers did not request the information and an inordinate amount of work would have been required to calculate the carrying charges for each

---

[2] As the Tax Tribunal noted, the disputed amounts have at different times been called volumetric surcharge, surcharge, volumetric surcharge interest, volumetric surcharge interest component, purchase gas adjustment (PGA) account interest, PGA account carrying charge, interest paid, interest earned, interest due, interest billed, interest income, income, debt, carrying charge, and time value of money (TVM). The term "time value of money" is a term of art in the financial community that refers to the concept that a dollar received today is worth more than a dollar to be received in the future. See *Perry Drug Stores, Inc v Dep't of Treasury*, 229 Mich App 453, 458 n 4; 582 NW2d 533 (1998), citing 9B Am Jur 2d, Bankruptcy, § 2631, pp 357-359. The Tax Tribunal, in an attempt to simplify this bewildering array, referred to the disputed "TVM" charges as volumetric surcharge carrying charges (VSCCs) and purchase gas adjustment carrying charges (PGACCs). We continue the Tax Tribunal's nomenclature as much as possible. "Volumetric surcharge" is used here to discuss the amounts actually billed to the customers as a charge per unit of gas.

PGACCs and VSCCs are not identical. However, the parties have agreed they are materially indistinguishable for the purposes of analysis under the SBTA, and the Tax Tribunal accepted that assessment. Thus, both parties concede that, if the VSCCs are not "interest," then neither are the PGACCs.

[3] Respondent does not challenge the exclusion of these direct-billing interest payments from petitioner's SBT base.

invoice to each of [its] many customers." Instead, the customers who were charged volumetric-surcharge amounts were only provided with a total charge, which consisted of a multiplication of the decatherms of gas used by a rate per decatherm rather than separate "principal" and "interest" charges.[4] The volumetric surcharge borne by a customer bore no relation to the amount of gas that customer previously purchased from petitioner. Even new purchasers were required to pay the charge. There was also no obligation on the part of former customers to make any volumetric-surcharge payments, either in terms of principal or VSCC, if they elected to make arrangements with someone other than petitioner for their gas requirements.

Petitioner filed federal income tax returns for 1989 through 1994. In 1989 and 1990, petitioner reported the direct billing carrying charges as gross receipts, but in later years reported them as interest income. In 1989, 1990, and 1991, petitioner reported all or portions of the volumetric-surcharge payments as gross receipts, but in later years reported them as interest income as well. Because both alleged interest and principal components were treated as ordinary income for federal income tax purposes, no federal income tax consequences to petitioner resulted from the change. However, the SBT base consequences were another matter, as more fully discussed in part II. As a result, petitioner attempted to exclude from its SBT base "the carrying charges component of the direct billings and volumetric

---

[4] Volumetric surcharges were based on predicted FERC rates and predicted yearly gas sales, or "throughput volumes." The surcharge was periodically adjusted on the basis of quarterly fluctuations in the FERC rates, as well as actual decatherms of gas sold or transported. Shortfalls in yearly "interest" revenue were added to the remaining "principal" and carried forward to the next year. It is unclear whether customers received a refund of any excess "interest" paid.

surcharges," but only after "reclassifying" its own books to separate out the "interest component" from the rest of the volumetric-surcharge payments that were recorded as one total payment in its revenue accounts.[5] Following respondent's discovery that one of petitioner's major customers did not add the "interest" payments back into its own SBT base for purposes of its SBT calculation, respondent's auditor questioned why petitioner was subtracting the payments from its SBT base. Ultimately, respondent issued "Notices of Intent to Assess" or "Proposed Assessments" seeking to recover the additional taxes due as a result of the inclusion of the VSCC and PGACC payments into petitioner's SBT base for the years in question. Petitioner contested the assessments. Initially, a referee recommended a determination that the interest portion of the volumetric-surcharge payments were properly excluded from the SBT returns on the basis of a finding that the "unique status of the taxpayer" was controlling and that a "legal fiction" had been created of a debtor-creditor relationship between the current customers and petitioner. The Revenue Commissioner subsequently rejected the referee's recommendation. Focusing on the lack of a preexisting debtor-creditor relationship and the treatment of interest under the SBTA, he found that the payments did not "constitute money paid for the use of or forbearance of using money," and thus could not be excluded from the SBT base.

Following this decision, petitioner sought review before the Tax Tribunal. The matter was tried on stipu-

---

[5] Petitioner further admits that the change in the reported status of the VSCC payments on its federal income tax returns was an attempt to overcome respondent's 1989 disallowance of the interest income in petitioner's 1989 SBT return, the first year petitioner attempted to exclude these payments from its SBT base.

lated facts. The tribunal found in favor of respondent. It held that, despite their designation as "interest," the VSCC payments were different substantively from traditional interest payments. Instead, the sums were intended as a means to correct a competitive imbalance in the regulated gas transmission industry, and they actually performed as "revenue" in the hands of petitioner, the economic actor. The tribunal found that it was this substantive reality that controlled the question whether the VSCC payments were to be considered interest for SBT purposes. Like the Revenue Commissioner, the tribunal focused on the lack of a preexisting debtor-creditor relationship between petitioner and its newly billed customers to find that no present customer was "using" petitioner's money and, thus, the payments did not actually constitute interest. It further found that petitioner's characterization was hampered by the fact that (i) the VSCC payments were not evidenced by a fixed contract, (ii) the amounts of principal and interest were not set forth separately on petitioner's books or billed separately to customers, (iii) there was no opportunity to escape the interest component by immediate payment of the principal amount, and (iv) petitioner was not in the principal business of lending money.

## II. TREATMENT OF CHARGES UNDER THE SINGLE BUSINESS TAX ACT

Petitioner first argues that the Tax Tribunal erred when it refused to allow petitioner to treat the VSCC payments as "interest" for purposes of exclusion from petitioner's SBT base. It maintains that these payments are interest as defined under *Town & Country Dodge, Inc v Dep't of Treasury*, 420 Mich 226; 362 NW2d 618 (1984). We disagree.

"In the absence of fraud, review of a Tax Tribunal decision is limited to determining whether the tribunal erred in applying the law or adopted a wrong principle. The Tax Tribunal's factual findings are conclusive if supported by competent, material, and substantial evidence on the whole record." *Catalina Marketing Sales Corp v Dep't of Treasury*, 470 Mich 13, 18-19; 678 NW2d 619 (2004). The appellant bears the burden of proof in an appeal from an assessment, decision, or order of the Tax Tribunal. *Dow Chemical Co v Dep't of Treasury*, 185 Mich App 458, 463; 462 NW2d 765 (1990).

### A. OVERVIEW OF THE SBTA

The SBT is best understood as a value-added tax, although it is not a pure value-added tax because it permits various exclusions, exemptions, and industry-specific adjustments. See Haughey, *The economic logic of the single business tax*, 22 Wayne L R 1017, 1024-1027 (1976); *Caterpillar, Inc v Dep't of Treasury*, 440 Mich 400, 408-409; 488 NW2d 182 (1992); *Perry Drug Stores, Inc v Dep't of Treasury*, 229 Mich App 453, 454; 582 NW2d 533 (1998). " 'Value added is defined as the increase in the value of goods and services brought about by whatever a business does to them between the time of purchase and the time of sale.' " *Trinova Corp v Dep't of Treasury*, 433 Mich 141, 149; 445 NW2d 428 (1989), aff'd 498 US 358 (1991), quoting Haughey, *supra* at 1018. See also *Mobil Oil Corp v Dep't of Treasury*, 422 Mich 473, 493; 373 NW2d 730 (1985). In short, a value-added tax is a tax upon business or economic activity. *Trinova, supra* at 149. The SBTA employs a value-added measure of business activity, but its intended effect is to impose a tax on the privilege of conducting business activity within Michigan and is not to impose a tax upon income. *Id.*, citing former MCL

208.31(4), now MCL 208.31(3). In fact, the Michigan Supreme Court has stated that an income tax and a value-added tax are "in reality opposite sides of the same coin," *Mobil Oil, supra* at 494, and has provided the following explanation:

> Both income taxes and value-added taxes are taxes on the economic process; the difference between them lies in what point of the process they attach to or, to put it another way, in what elements of the economic process they tax. The income tax taxes what has been received from the economy, when it becomes "income." The [value-added tax] taxes economic activity itself and can be described in two ways: as a tax on the economic actor's use of the scarce resources of society, or as a tax on the value the economic actor adds to the economy. In the end, the income tax and the [value-added tax] tax the same things, but at different stages of the economic process, and thus generate the same amount of revenue and affect the economy identically. [*Id.* at 492-493.]

The SBTA imposes a specific tax on the adjusted tax base of every person with business activity in this state. MCL 208.31(1).[6] "Tax base" is defined in § 9(1) as business income subject to the adjustments in subsections 2 through 9. MCL 208.9. "Business income" is defined as federal taxable income. MCL 208.3(3). However, further complications arise from changes made to the tax base. Section 9 of the SBTA allows for certain "adjustments" to business income, either subtractions from or additions to the tax base, before the computation of the tax. MCL 208.9.

---

[6] The rate was 2.35% before October 1, 1994. Effective October 1, 1994, the rate decreased to 2.30%. Pursuant to 1999 PA 115, the rate decreases 0.1% each year following a year in which the state's countercyclical budget and economic stabilization fund ("rainy day fund") remains above $250 million. Pursuant to 2002 PA 531, the SBTA has a sunset provision whereby it is repealed effective for tax years that begin after December 31, 2009.

Thus, in calculating the tax base, the starting point is business income, to which the adjustments under § 9 are made. One such set of adjustments requires the *addition* to business income of "compensation," MCL 208.9(5), as well as dividends, *interest,* and royalties *paid by the taxpayer,* to the extent deducted from federal taxable income, MCL 208.9(4)(d), (f), and (g). These amounts are added back into the tax base because they represent "items that reduce profit and therefore [are] taken as deductions from the federal income tax, but do not reduce the value added to the product during production . . . ." *Perry, supra* at 454-455.[7]

Another set of adjustments, at issue in the instant case, allows for the *subtraction* or *removal* from business income, to the extent included in federal taxable income, of dividends, *interest,* and royalty income *received by the taxpayer. Id.* at 455; MCL 208.9(7)(a), (b), and (c). These items are removed from the SBT base "because, although those items represent income for federal tax purposes, they do not represent value added to the product. That is, they do not result from the use of capital by the recipient." *Perry, supra* at 455, citing Kasischke, *Computation of the Michigan single business tax: Theory and mechanics,* 22 Wayne L R 1069, 1081 (1976). In order to claim an adjustment under subsection 7(b), a taxpayer must show that (1) the income was "interest," (2) it was paid or payable *to* the taxpayer, and (3) it was included in determining the taxpayer's federal income tax liability. *J C Penney Co, Inc v Dep't of Treasury,* 171 Mich App 30, 38-39; 429 NW2d 631 (1988).

---

[7] Thus, as the Tax Tribunal noted, if these VSCC payments are really "interest" payments, petitioner's customers should have been adding these amounts back to their own SBT bases. This forms the basis for respondent's assertion that the issue is not "revenue driven."

.

In the present case, the parties do not dispute that the VSCC payments, along with the total of the volumetric surcharges, were characterized as income in determining petitioner's federal tax liability. Since the SBTA does not define "interest," the sole issue on appeal is whether petitioner's receipt of these VSCC payments constitutes receipt of "interest" under MCL 208.9(7)(b), which is, therefore, excludable from its SBT base.

In deciding this question, we find a number of guiding principles applicable to this case. First, in general, exemptions from taxation are not favored. *Town & Country Dodge, supra* at 242. Further, statutory exemptions are construed strictly against the taxpayer. *Id.* at 243. It is also generally acknowledged that a deduction " ' "depends upon legislative grace; and only as there is clear provision therefor can any particular deduction be allowed." ' " *Id.* (citations omitted). Moreover, we note that the Department of Treasury's interpretation of the characterization of the VSCC charges is entitled to considerable deference. *Ansell v Dep't of Commerce (On Remand)*, 222 Mich App 347, 354; 564 NW2d 519 (1997).

### B. CASE LAW DISCUSSING "INTEREST" UNDER THE SBTA

Petitioner argues at length that its position is supported by the fact that the FERC has allowed petitioner to characterize the VSCC payments as interest, and the IRS's acceptance of petitioner's inclusion of these amounts as "interest" in its federal income tax returns. In doing so, petitioner appears to rely on the principle that, under MCL 208.2(2),

[a] term used in this act and not defined differently shall have the same meaning as when used in comparable context in the laws of the United States relating to federal

income taxes in effect for the tax year unless a different meaning is clearly required. A reference in this act to the internal revenue code includes other provisions of the laws of the United States relating to federal income taxes.

However, MCL 208.2 is only slightly helpful here. In *Town & Country Dodge,* the Supreme Court decided that this provision does not address whether a payment should be considered "interest" under the SBTA:

> The parties have not cited comparable federal statutory authority concerning the definition of interest, nor have we located any statutory authority to that effect. As noted previously, the SBTA requires that terms not defined in the act shall have the same meaning, *as when used in comparable context* in the laws of the United States relating to federal income taxes. The uniqueness of the SBTA militates against locating federal authority that is in "comparable context." Section 61 of the Internal Revenue Code, 26 USC 61, provides that gross income includes "interest," but it does not define it. [*Town & Country Dodge, supra* at 240 (emphasis in original).]

Therefore, it is not dispositive that the FERC and the IRS allowed the payments to be characterized as interest. Instead, the *Town & Country Dodge* Court provided its own definition to determine excludible interest. This Court, in *Perry,* provided a summary of the relevant facts and holding of *Town & Country Dodge*:

> For comparative purposes, a detailed explanation of the transaction in *Town & Country* is helpful. The Court, in pertinent part, described it as: a customer buys a car for $10,000. He puts down a deposit of $2,000 and finances $8,000 over three years at sixteen percent. After taking into account the time value of money, a $26.57 time-price differential charge per $100 is assessed for a total time-price differential charge of $2,125.60 (26.57 x 80), making total payments to the dealer on the contract of $10,125.60. The dealer then takes the contract, extended over three years, and discounts this $10,125.60 note to a financial

institution. A draft is drawn on the bank account of the financial institution or the financial institution remits its own check for the amount of $8,000 plus a portion of the time-price differential charge. For purposes of this illustration, this portion of the time-price differential charge is $210 (approximately ten percent of the total time-price differential). Consequently, the dealer would then have a draft in the amount of $8,210 of its own, having left the balance of the time-price differential charge as profit for the financial institution. At issue in *Town & Country* was the characterization of this $210 premium in the hands of the car dealerships. The buyer would then directly pay the financial institution thirty-six monthly installments of $281.27 ($10,125.60/36 = monthly payments). There are no more checks given to the dealer and no more funds are being received by the dealer from the financial institution. However, in the event that the time-price differential agreement is paid off on a shorter basis or there is a default by the buyer resulting in a loss to the financial institution, there is a proportionate share of the time-price differential charge charged back to the dealer. For example, if the note is paid within two years, the dealer has a charge back of the one-year time-price differential charge that he has retained, inasmuch as such time-price differential charge has not been earned and in fact has been prepaid. At issue in *Town & Country* was also the characterization of this charge back to the plaintiff dealerships. Their contention was that it was "interest income" and therefore should be deducted from their SBTA tax bases.

The Court found and the parties conceded that the time-price differential charges paid by the customer to the financial institution constituted "interest income." The issue became whether this interest, in the hands of the financial institution, retained this characterization when it was rebated to the plaintiff's car dealerships. The Court acknowledged that neither the SBTA nor federal tax law specifically defined "interest" and relied on rules of statutory interpretation in attempting to ascertain the intent of the Legislature. *Town & Country, supra* at 239-240. It held that, because the SBTA did not specifically define "inter-

est," the Legislature intended that the word be construed according to its ordinary and primarily understood meaning, and therefore defined "interest" as

"[c]ompensation allowed by law or fixed by the respective parties for the use or forbearance of money, 'a charge for the loan or forbearance of money,' or a sum paid for the use of money, or for the delay in payment of money. [*Id.* at 242, citing *Balch v Detroit Trust Co,* 312 Mich 146, 152; 20 NW2d 138 (1945); *Coon v Schlimme Dairy Co,* 294 Mich 51, 56; 292 NW 560 (1940); *Marion v Detroit,* 284 Mich 476, 484; 280 NW 26 (1938); *Drennan v Herzog,* 56 Mich 467, 469; 23 NW 170 (1885); 47 CJS, Interest & Usury, § 3, pp 18-22.]"

In applying this definition to the facts in *Town & Country,* the Court held that any amount returned to the plaintiffs was not money paid for the use of or forbearance from using money and the rebates therefore were not interest income. It reasoned that because the addition of interest expense on their floor-plan financing to business income was mandated by statute, MCL 208.9(4)(f); MSA 7.558(9)(4)(f), a rebate or return to the plaintiffs of a portion of the finance charges that plaintiffs had paid in connection with the floor-plan financing of their inventories was not money paid to the plaintiffs for the use of money or the forbearance or delay in the use of money. *Town & Country, supra* at 244. It further reasoned that, although generally accepted accounting principles may have required that a return of a portion of that interest be credited on the dealerships' books as "interest refund," a refund of interest is not "interest income" within the meaning of the SBTA. *Id.* [*Perry, supra* at 458-461.]

*Perry* itself was a case in which a prescription drug retailer sought tax refunds stemming from cash refunds it received from drug manufacturers because of early payment. For example, if the invoice stated "2/10, net 30," a two-percent discount would be allowed if the invoice was paid within the first ten days, but no discount would be available if the account was paid on time between the eleventh and the thirtieth day. *Perry,*

*supra* at 461-462. The discounts were not always "taken" by the plaintiff, because it did not always pay its suppliers within ten days. The plaintiff used the "gross method" of accounting in which the discount paid or taken was treated as a separate source of "income" from the profits it received from the sale of the products to its customers. *Id.* at 456-457 and n 3.[8] The plaintiff sought to treat this additional "income" as "interest income" paid to it for purposes of calculating its SBT, ostensibly on the theory that the payment represented a value for the forbearance of the plaintiff's money. *Id.* at 461-462 and n 5. This Court disagreed. It agreed with *Town & Country Dodge* that the fact that transactions are carried on a taxpayer's books under generally accepted accounting principles as interest is not determinative of the status of the transaction under the SBTA. *Id.* at 463-464. It further noted that the plaintiff's suppliers were not in the commercial lending industry and that, although there was a time element to the rebate, purchase discounts were "not strictly time-price differential transactions that are usually associated with interest such as discount bonds or discounted chattel paper . . . ." *Id.* at 462. In addition, the Court noted that, while the definition of "interest" requires that the parties have a "fixed" rate for the use or forbearance of money, the contract at issue did not contain a specific interest rate, nor was the plaintiff contractually bound to forbear the use of its money. "Simply stated, [the] plaintiff could take the discount or it could elect not to do so." *Id.* at 463. The Court also held that the Department of Treasury's interpretation

---

[8] This is compared in *Perry* to the "net method" of accounting, in which the plaintiff would essentially have claimed a larger profit for every sale, whether or not the discount was taken, and then separately subtract any purchase discount it did not take from this profit. *Perry, supra* at 456-457 and n 3.

of the transaction was entitled to deference. *Id.* at 463. It then found that the discounts were akin to the "rebates" in *Town & Country Dodge. Id.* at 462. "Simply put, a purchase discount taken is more akin to a reduction [to the taxpayer] in the purchase cost of goods than it is to interest on money invested." *Id.* at 464.

Thus, a number of considerations have been deemed important when applying the definition of interest from *Town & Country Dodge.* The characterization of payments as interest for federal income tax purposes is largely irrelevant when trying to decide the characterization of payments for SBTA purposes, as is the taxpayer's method of accounting for the payments. It is the practical substance of the transaction that matters. In characterizing the payments, SBTA concepts and value-added-tax concepts control. Also important is the substance of the character of the payments in the hands of the taxpayer. *Town & Country Dodge, supra* at 243. The fact that a disputed amount is interest when viewed from the point of view of a different actor in a separate transaction is not dispositive.

### C. APPLICATION TO THE INSTANT CASE

Looking at the facts of the instant case, the considerations outlined in *Town & Country Dodge* and *Perry*, and the underlying guiding principles with which we are to decide whether petitioner has shown that it is entitled to a deduction from its tax base, we affirm the decision of the Tax Tribunal.

Like the situation in *Perry*, the situation here does not fit clearly within the definition of interest as set out in *Town & Country Dodge.* The definition of interest requires that the parties involved have a "fixed" rate for the use or forbearance of money, usually pursuant to a contract or by law. *Town & Country Dodge, supra* at

241; *Perry, supra* at 463. The contracts in *Perry* involved purchase invoices whereby the parties did not agree to a specific interest rate, nor did the plaintiff agree to be contractually bound to forbear its money. The fact that the plaintiff could choose to take the discounts or not amounted to a lack of contractual forbearance. *Id.* at 463. The situation in the present case is similar. There is no contract with specific "fixed" interest terms, of even a variable rate.[9] There is no specific payment due. The VSCCs were based only on the decatherms of gas used or transported. No customer is obligated to take a specific amount of gas. Each customer is free to take or transport as much, or as little, as it needed. Also, as noted by the Tax Tribunal, there is no opportunity for customers, especially new customers, to escape the "interest component" by immediate payment of the principal amount.

Another telling difference between the instant situation and a traditional "interest" transaction is that there is no fixed debtor or debtors here. The customers who actually purchased gas during the take-or-pay period were repaying at least part of their "share" of the burden through the direct-billing charges, which did include "interest" on the amount actually owed and not immediately repaid. But any other continuing relationship was essentially illusory. Previous customers who might be said to have an additional burden to shoulder could, theoretically at least, simply stop taking or transporting any gas. New customers, who may not even have been in existence at the time of the resolution

---

[9] Petitioner argues that the interest here was "allowed by law" and that this forms part of the basis to reverse the Tax Tribunal. Petitioner appears to misread some of the import of the *Town & Country Dodge* requirement. While the amount at issue may be "allowed by law" rather than "fixed by the respective parties," it still must be "for the use or for forbearance of money" in order to be properly characterized as interest.

of the take-or-pay problems, were forced to pay the same volumetric surcharge. And these customers, too, could simply look elsewhere for gas. We find untenable petitioner's attempt to characterize the VSCC payments as interest owed on a debt by "potential" debtors.

Despite petitioner's underlying argument that its present and future customers were placed into a debtor-creditor relationship with petitioner as a matter of law because of the FERC's rulings, petitioner maintains that no such requirement need exist for there to be an interest component recognized for SBTA purposes. Petitioner presents an example of interest payments that do not involve a preexisting debtor-creditor relationship involving a third party who assumes a preexisting mortgage without taking personal liability on the underlying note. This example is not akin to the facts here. In petitioner's example, the third party takes possession of the real estate involved and thereby "uses" the money represented by the real estate, in the same way that the original mortgagor did. Here, a similar case might occur if the purchaser of a company who owed a direct-billing charge to petitioner assumed the payments. The third party would step into the preexisting relationship as a replacement for the debtor. But for volumetric surcharges, owed only on future gas purchases, the analogy does not fit. Nor does petitioner's example of prejudgment interest payable pursuant to MCL 600.6013, because any losing defendant's liability for that interest stems from its prior (harmful) relationship to the plaintiff or the other parties seeking contribution. Thus, while a traditional preexisting debtor-creditor relationship may not be an essential requirement, the lack of any similar relationship in the instant case, especially as to the new customers, sub-

stantially weakens petitioner's position that the VSCCs were interest for SBTA purposes.

In addition, similar to the situations in *Perry* and *Town & Country Dodge*, the fact that the IRS allowed petitioner to characterize the VSCC payments as "interest" is not particularly helpful to petitioner. In *Perry*, for example, the Court noted that the IRS allowance of the characterization of the purchase discounts as separate payments in the "gross method" of accounting, as compared to a different treatment in the "net method" of accounting, would make no difference for purposes of calculating federal income tax. "In either case, the IRS is satisfied—the taxpayer pays tax on $5,200 if the discount is taken and on $5,000 if it is not." *Perry*, *supra* at 457 n 3. Likewise, the IRS in this case would not care whether petitioner characterized the VSCC payments as interest or regular income.

A number of other factors also weigh against treating the VSCC payments as "interest" for purposes of the SBTA. Petitioner admits that it did not separate out the "principal" and "interest" portions of the volumetric-surcharge payments on its invoices to its customers or even in its own revenue accounts. Petitioner also admits that it only belatedly separated out the "interest" component of the volumetric-surcharge payments on its federal tax returns when trying to reduce its SBT base. Therefore, apart even from petitioner's confusing nomenclature, petitioner's own treatment of these payments was less than consistent. In addition, petitioner's treatment of these payments seems to have effectively prevented respondent from recovering single business taxes from petitioner's customers, who did not have the interest payments set out separately in the invoices. If the VSCC payments really were "interest" for SBTA purposes, they should have been delineated as such so they could be added back to the customers' business

incomes under MCL 208.9(4).[10] We find that petitioner's argument that the VSCC payments are "clearly" interest for SBTA purposes is weakened by its earlier actions.

And like the plaintiff's suppliers in *Perry*,[11] petitioner in the instant case is not in the commercial lending industry.[12] As petitioner maintains, there is a TVM component of these VSCC payments. However, petitioner's customers are not paying for the use of petitioner's money in the sense contemplated by the SBTA exclusion. See *Perry, supra* at 462. If such were the case, the instances of excludable interest would become overbroad. Every transaction that involves previously purchased inventory for resale or rental or the use of preexisting infrastructure arguably includes a TVM component calculated to offset the time-price differential involved. One who rents a piece of industrial equipment implicitly pays for the privilege of "using" another's previous capital expenditure in an amount designed to compensate the owner for its inability to instantly recover the full cost of the purchase. The fact that the instant case involves a FERC-sanctioned TVM component rather than such an internally calculated component does not substantially change the nature of the transaction.

---

[10] Petitioner maintains that the interest component of each customer's volumetric surcharge was easily determinable from the annual reconciliations filed and also provided to some customers. However, these reports did not purport to provide individual customer information.

[11] *Perry, supra* at 462.

[12] During oral argument, petitioner argued that the FERC had essentially placed it in the position of a financial organization that provided financing to its customers using FERC-created interest rates. However, were we to find that to be the case, petitioner would remain in an untenable position. Financial organizations are unable to subtract interest income received by the taxpayer from business income. MCL 208.21(1).

The Tax Tribunal was correct in its interpretation that it is the practical substance of the transaction that controls. In the instant case, the FERC regulations were designed to ensure that, as long as petitioner has some customers, it would ultimately recover the take-or-pay settlement amounts from other than its own pocket. The "interest" payments were in actuality a means designed to ensure that petitioner would not be further disadvantaged if the reimbursement took longer. As aptly noted by the Tax Tribunal, the entire mechanism is designed to "correct a competitive imbalance in the regulated gas transmission industry . . . ." The payments are designed to act as revenue in petitioner's hands. And like the rebates in *Perry*, the final effect of the FERC's ruling is a situation essentially calculated to reduce the purchase cost of goods, i.e., natural gas, by petitioner (the taxpayer), rather than interest on money invested. *Perry, supra* at 464. "The value added by the production of a final good is the sum of the value of the raw materials, intermediate goods, labor, capital, and the profit which were combined in order to produce that final good." *Mobil Oil, supra* at 493. Despite petitioner's claims that this concept is unhelpful where numerous parties add value to the product, we find it applicable to the instant case. Thus, we are satisfied that the treatment of the VSCC payments as includable in petitioner's SBT base is consistent with the purpose behind the SBTA. Petitioner is taxed for the amount it added to the value of the gas when it was in petitioner's hands.

Finally, we note that the Department of Treasury's interpretation of the characterization of the VSCC charges is entitled to considerable deference. *Ansell, supra* at 354.

For these reasons, we hold that petitioner has failed to meet its burden of demonstrating that the transactions at issue here fit clearly within meaning of "interest" as used in *Town & Country Dodge*. See *Town & Country Dodge, supra* at 242-243. We thus affirm the decision of the Tax Tribunal and find that the VSCC and PGACC payments should not be deducted from petitioner's federal taxable income for the purposes of calculating petitioner's SBT base.

### III. RES JUDICATA/COLLATERAL ESTOPPEL

Petitioner next argues that respondent is estopped from denying that the VSCC payments are properly characterized as interest. The state of Michigan, through the Public Service Commission (PSC), intervened in one of the petitioner's filings before the FERC. Therefore, petitioner maintains that respondent should now be barred from denying that the VSCC charges are interest because the PSC previously had the opportunity to contest the characterization of those charges and did not do so. We disagree.

Petitioner first argues that respondent is estopped from denying that the monies collected by it are interest. However, petitioner also admits that respondent "had the opportunity to contest" the characterization of the monies under the SBTA in the FERC filing, but failed to do so. Thus, collateral estoppel is inappropriate because the actual question was never raised and decided. *McMichael v McMichael*, 217 Mich App 723, 727; 552 NW2d 688 (1996), citing *Porter v City of Royal Oak*, 214 Mich App 478, 485; 542 NW2d 905 (1995).

Petitioner also argues that respondent's arguments are barred by res judicata. We find this argument unpersuasive. The doctrine of res judicata is generally employed to prevent multiple suits litigating the same

cause of action. The doctrine bars a subsequent action when (1) the prior action was decided on the merits, (2) both actions involve the same parties or their privies, and (3) the matter in the second case was, or could have been, resolved in the first. *Adair v Michigan*, 470 Mich 105, 121; 680 NW2d 386 (2004); *Sewell v Clean Cut Mgt, Inc*, 463 Mich 569, 575; 621 NW2d 222 (2001). The Michigan Supreme Court has taken a broad approach to the doctrine of res judicata. The Court has held that it bars not only claims already litigated, but also every claim arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not. *Adair, supra* at 121; *Dart v Dart*, 460 Mich 573, 586; 597 NW2d 82 (1999).

Petitioner relies on *Sunshine Anthracite Coal Co v Adkins*, 310 US 381, 402-403; 60 S Ct 907; 84 L Ed 1263 (1940), to argue that the PSC is in privity with respondent on the ground that "each officer or agency of State government is in privity with all other officers or agencies." However, the question is not as simple as petitioner suggests. Although the *Sunshine* Court indicated that privity might exist between officers of the same government, it pointed out that "[t]he crucial point is whether or not in the earlier litigation the representative of the United States had authority to represent its interests in a final adjudication of the issue in controversy." *Id.* at 403. See also *Baraga Co v State Tax Comm*, 466 Mich 264, 270; 645 NW2d 13 (2002), citing 50 CJS, Judgments, § 869, p 443 (a state may be bound by a judgment for or against a public officer, or agency, but only with respect to a matter concerning which the officer or the agency is authorized to represent the state). Here, petitioner has not shown that the PSC had the authority to represent the

state's interest in collecting state taxes or in characterizing these amounts as "interest" under the SBTA.

Similarly, petitioner's argument is problematic under the privity requirement delineated in *Adair*, which described the "outer limit of the doctrine traditionally [as requiring] both a 'substantial identity of interests' and a 'working functional relationship' in which the interests of the nonparty are presented and protected by the party in the litigation." *Adair, supra* at 122 (citations omitted). As noted in *Baraga Co,* this definition of privity originated in cases involving private parties and has not been routinely applied to government agencies. *Baraga Co, supra* at 270. In *Adair,* the majority of the Court found that the plaintiffs could be in privity with other plaintiffs who had raised similar Headlee-related[13] claims in an earlier suit.[14] However, the *Adair* Court specifically found that the school-district plaintiffs in that case had the same legal interest protected by the earlier plaintiffs primarily because the parties sought identical declaratory relief. *Adair, supra* at 122-123. Here, however, the PSC and respondent do not share identical interests as did school-district plaintiffs in *Adair*. Thus, petitioner's statement that privity exists is problematic even under *Adair*.

Moreover, even if this Court were to conclude that the PSC and respondent were in privity, petitioner's res judicata argument suffers from another deficiency. Petitioner makes no showing that the FERC had the jurisdiction or authority to resolve the instant question, i.e., whether these amounts would be considered non-includable "interest" income for purposes of the SBTA under the standard set out in *Town & Country Dodge*.

---

[13] Referring to Michigan's Headlee Amendment found in Const 1963, art 9, §§ 25 through 34.

[14] See *Durant v Michigan,* 456 Mich 175; 566 NW2d 272 (1997).

We thus conclude that petitioner has failed to establish that respondent's attempt to characterize these payments as other than interest is barred by res judicata.

Affirmed.